FEE PAID

FILED
CLERK, U.S. DISTRICT COURT

SEP 14 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

1  WARREN METLITZKY (CA Bar No. 220758)
   Email:      wmetlitzky@conradmetlitzky.com
2  ELLEN RICHMOND (CA Bar No. 277266)
   Email:      erichmond@conradmetlitzky.com
3  MIGUEL GRADILLA (CA Bar No. 304125)
   Email:      mgradilla@conradmetlitzky.com
4  **CONRAD & METLITZKY LLP**
   Four Embarcadero Center, Suite 1400
5  San Francisco, CA 94111
   Tel:   (415) 343-7100
6  Fax:   (415) 343-7101

7  Attorneys for Plaintiff
   ABBOTT LABORATORIES
8

9             UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  ABBOTT LABORATORIES,                CASE NO. 2:20-CV-08403-ODW-PLAx

13        Plaintiff,                    **COMPLAINT FOR:**

14     v.                              1. TRADEMARK INFRINGEMENT,
                                            LANHAM ACT
15  ABBOT GENETICS INC., NANA          2. FALSE DESIGNATION OF ORIGIN
    YALLEY, an individual, AND DOES 1-     AND UNFAIR COMPETITION
16  10,                                3. CYBERSQUATTING
                                       4. COUNTERFEITING
17        Defendants.                  5. TRADEMARK INFRINGEMENT,
                                            CALIFORNIA LAW
18                                     6. UNFAIR COMPETITION

19                                     **JURY TRIAL DEMANDED**

20                                     **[FILED UNDER SEAL]**[1]

21

22

23

24

25        [1] Pursuant to Local Rule 79-5.2.1(b), a motion to file this action temporarily under
26  seal is filed concurrently herewith. Plaintiff asks that the case be filed under seal
    temporarily, until after the Court has ruled on the instant *ex parte* application for a
27  temporary restraining order, so as not to alert the Defendants or other involved parties to
28  the filing of this civil action or to Plaintiff's request for an asset seizure.

- 1 -
COMPLAINT

1)    In the midst of a public health crisis, Plaintiff Abbott Laboratories ("Abbott") comes before this Court to stop a scheme perpetrated by Defendant Abbot Genetics Inc. ("Abbot Genetics"). Specifically, Abbott Laboratories (two "t's") brings this complaint to stop Abbot Genetics (one "t") and its Chief Executive Officer, Nana Yalley (collectively, "Defendants") from hawking counterfeit and/or infringing COVID-19 tests under its valuable trademark.

## PRELIMINARY STATEMENT

2)    A pandemic is raging. Tens of millions of people have contracted the novel COVID-19 coronavirus. Hundreds of thousands have died from it. The virus has upended every aspect of American life and decimated the economy.

3)    Since the COVID-19 pandemic began, diagnostic testing has emerged as the critical tool in the fight to detect and combat the virus. Just a few major companies lead the worldwide effort to develop these critical tests. Both the public and the government have turned to these select few companies for help in ending this crisis.

4)    Plaintiff Abbott Laboratories ("Abbott") is one of those companies. For decades, Abbott has been recognized throughout the country and the world for its leadership in diagnostics. Now, building on decades of global leadership, Abbott has risen to the fore in taking on COVID-19. As early as March 2020, Abbott gained the first in a long line of regulatory authorizations to market trusted COVID-19 diagnostics in the U.S. and elsewhere. The U.S. Food and Drug Administration ("FDA") alone has authorized six such tests, and Abbott has already shipped tens of millions of them.

5)    In the wake of Abbott and its peers comes a stream of imposters looking for a quick profit. Abbot Genetics is one of those companies. Formed mid-pandemic, Abbot Genetics' business model is to draft off Abbott's hard-earned consumer goodwill. On information and belief, Abbot Genetics' "Chief Executive Officer," Defendant Nana Yalley, has no medical training and no track record in the testing industry. Yalley does have connections, however, to a series of defunct business entities that are no longer authorized to do business.

6)     Yalley and Abbot Genetics are now selling COVID-19 tests, including tests recently de-listed by FDA, using Abbott's name without the second, silent "t". Yalley's hope, apparently, is to benefit as much as possible from Abbott's reputation and consumers' fear and panic before he moves on, as he has done so many times before.

7)     This lawsuit is necessary because Defendants are exploiting Abbott's intellectual property to sell their products. Specifically, Defendants are infringing on Abbott's registered and incontestable trademarks—marks that are valuable because they reflect Abbott's legacy of scientific innovation and over a century of dedication to patient safety. Abbott prides itself on the trust that it has built around the world and the reputation it has built for developing and selling trusted diagnostic products.

8)     By this action, Abbott invokes the Court's assistance to protect its name from exploitation by Defendants and to preserve the trust it has established with healthcare companies and patients around the globe. Abbott prays that the Court enjoin Defendants' unlawful infringement of its trademarks, halt Defendants' unfair and anticompetitive business practices, and, among other remedies, disgorge any and all profits that Defendants have reaped from their illegal use of Abbott's name.

## PARTIES

9)     Plaintiff Abbott Laboratories is an Illinois corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064. Founded in 1888, Abbott is a multinational healthcare company and a worldwide leader in diagnostic solutions, including COVID-19 testing. Abbott promotes its products, including COVID-19 tests, using trademarks that are registered and have been established as incontestable with the United States Patent and Trademark Office ("USPTO"). Healthcare professionals and other consumers recognize Abbott's marks and associate them with high-quality and reliable products, including in the field of medical diagnostics.

10)     On information and belief, Abbot Genetics is a business entity that has filed papers to incorporate in both the State of Delaware and the State of California. Abbot Genetics was incorporated in March 2020. Abbot Genetics' principal place of business is

at 8549 Wilshire Boulevard, Unit 1407, Beverly Hills, California, 90211. Abbot Genetics markets and sells COVID-19 tests under the brand name "Abbot Genetics" and using the website domain www.abbotgenetics.com. Abbot Genetics sells COVID-19 tests in the United States and, on information and belief, also abroad.

11)   On information and belief, Defendant Nana Yalley is an individual residing at 26072 Tennyson Lane, Stevenson Ranch, California, 91381. Yalley is the Chief Executive Officer of Abbot Genetics. Yalley holds himself out as a businessman who has attempted to develop business in a wide swath of economic sectors, including clean energy, digital media and marketing, biotech, entertainment, talent recruiting, agronomy, plant design, and biomass conversion. Yalley has been associated with numerous business entities, including as an officer, director, or executive. Many of these businesses are suspended, dissolved, or defunct. Some also are associated with the same Beverly Hills street address where Abbot Genetics now has its principal place of business.

12)   The true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of the Defendants named herein as Does 1 through 10, inclusive, are presently unknown to Abbott, who therefore sues these Defendants by fictitious names. Abbott will seek leave to amend this Complaint to show the true names and capacities of these Defendants when their identities are ascertained. Abbott is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is a manufacturer, distributor, or other entity or individual, or agent, employee, or principal of such an entity or individual, engaged in the manufacturing, distribution, marketing, or sale of Abbot Genetics' infringing COVID-19 diagnostic tests.

## JURISDICTION AND VENUE

13)   This Court has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a). Abbott's claims are based, in part, on violations of the Lanham Act, as amended, 15 U.S.C. §§ 1051-1127. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

14)  This Court has personal jurisdiction over Defendants because Abbot Genetics' principal place of business is in the State of California, because Yalley resides within the State of California, because Defendants conduct business within the State of California, and because, in relevant part, Defendants have committed the unlawful acts described herein within the State of California.

15)  Venue in the Central District of California is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to this action occurred in this District and because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS
### Abbott Is a Worldwide Leader In Diagnostic Solutions

16)  Abbott has been a pioneer in the research and development of diagnostic solutions for decades.

17)  Since launching its first hepatitis test in 1972, Abbott has worked tirelessly to develop innovative ways to screen, diagnose, and monitor a vast range of health conditions with greater speed, accuracy, and efficiency. Within its diagnostic solutions business, Abbott offers core laboratory diagnostics, molecular diagnostics, point of care diagnostics, and rapid diagnostics. More than 60 million tests are run on Abbott diagnostic instruments worldwide every day.

18)  Abbott is the world leader in point-of-care testing. Point-of-care testing is medical diagnostic testing at the time and place the patient is seen. In 2019, Abbott delivered more than one billion point-of-care tests to healthcare professionals and patients around the world. Abbott's point-of-care tests provide real-time, lab-quality results that give doctors and patients the insights they need—in minutes—in a variety of environments.

19)  Abbott's diagnostic solutions have made it a global leader in the field of infectious diseases. For decades, Abbott has been at the forefront of viral surveillance. Among many other accomplishments, Abbott has developed one of the most

comprehensive infectious disease testing platforms in history (the m2000 system), collected one of the world's largest viral sample libraries, and developed diagnostics that screen 60 percent of the world's blood supply.

### Abbott Is a Leader in COVID-19 Diagnostic Testing

20)   Diagnostic testing is a critical part of the global fight against COVID-19. These tests identify COVID-19 present and past infections, which helps prevent the spread of the disease. Diagnostic test results inform clinical decisions about how to treat those suffering from it.

21)   Since the COVID-19 pandemic began, Abbott has developed and brought to market test after test for detecting COVID-19 and the antibodies that form during the immune response. To do so, Abbott adapted its existing test platforms, including the Alinity, m2000, and ID NOW test processing systems, which were already in use to test for other diseases. Building upon these existing platforms, which represent decades of diagnostic expertise and millions in research and development, Abbott was able to move quickly to meet the challenge of COVID-19.

22)   Abbott has received six COVID-19 test authorizations in the U.S., and other products have been authorized for use abroad. The m2000 molecular diagnostic test, which uses Abbott's existing m2000 platform to diagnose COVID-19 infection, received an emergency use authorization ("EUA") on March 18, 2020. The ID NOW molecular diagnostic test, which runs on Abbott's existing ID NOW platform, received an EUA on March 26, 2020. On April 14, 2020, Abbott received the European "CE mark" authorization for an antibody tests on Abbott's Panbio® platform; this is a point-of-care test that tests for the antibodies that are generated by the immune system during and after COVID-19 infection. On April 26, 2020, it received EUAs for its COVID-19 antibody tests on its Architect and Alinity I platforms. On May 11, 2020, it received an EUA for its third molecular diagnostic test, for use on the existing large-format Alinity m system. In August, Abbott received still more authorizations for its Panbio antigen (diagnostic) test,

which received the CE mark on August 18, 2020, and for its new COVID-19 test on its BinaxNOW® system.

### Abbott's BinaxNOW® Test Is A "Game Changer"

23)  On August 26, 2020, the FDA granted emergency use authorization for Abbott's rapid antigen test on Abbott's BinaxNOW® platform.

24)  Abbott's new test is portable (about the size of a credit card), affordable (sold for $5) and provides results in 15 minutes. It uses lateral flow technology, a reliable and familiar testing methodology. Abbott is now ramping up production of its latest antigen test.

25)  On August 27, 2020, the United States government announced that it had awarded a contract to Abbott for delivery of BinaxNOW® tests to expand testing throughout the country. The Department of Health and Human Services ("HHS") hailed Abbott's latest test as a "game changer," stating that "Abbott has the capability to scale up to meet the demand for antigen testing across the country and is the only known source[] that can immediately provide the required items to meet HHS's urgent needs."

26)  The launch of the BinaxNOW® test attracted attention from media outlets around the country, including *Science Magazine*, the *Los Angeles Times*, the *New York Times*, and the *San Francisco Chronicle*.

### Abbott Markets Its COVID-19 Tests Under Incontestable Trademarks

27)  Abbott promotes and sells its many COVID-19 tests under trademarks that are registered with the USPTO.  These trademarks (collectively, the "Abbott Marks") and the details relating to their registration are as follows:

| Mark | Reg. No. (Reg. Date) | Goods and/or Services |
|------|----------------------|-----------------------|
| ABBOTT | 4,023,123 (Sept. 6, 2011) | Chemical reagents, namely, reagent strips for body fluid testing for use in the scientific research industry; control solutions and control reagents for use with scientific apparatus and |

| | | instruments for quality control and calibration purposes. |
|---|---|---|
| | | Chemical reagents, namely, diagnostic medical reagent strips for use by individuals to test their own body fluids and for use by the medical profession. |
| | | Computer communications hardware for connection to a medical test instrument data storage memory and to a computer for downloading stored data to the computer and computer software, sold therewith, for displaying the downloaded data; computer software used to manage point of care diagnostic instrument test results. |
| | | Medical diagnostic apparatus used to detect and measure the level of substances in body fluids; lances, lancets and lancing devices and body fluid monitoring, diagnostic and testing apparatus and instruments and diagnostic kits containing test strips, test meter and control solutions; apparatus for measuring dosages and delivering pharmaceuticals, namely, medical pumps and pens. |
| | | On-line health and medical services, namely, providing an interactive database for exchange of information between a medical device user and healthcare providers, delivered via a global computer network. |
| ABBOTT | 3,842,268 (Aug. 31, 2010) | Reagents for scientific and medical research use; genetic diagnostic kits composed of DNA probes, reagents and antibodies for scientific research. |
| | | Medical diagnostic reagents; genetic diagnostic kits composed of DNA probes, detection |

|  |  |  |
|---|---|---|
|  |  | reagents and antibodies for use in clinical medicine.<br><br>Integrated system comprised of a computer, color monitor, optical disk drive and photographic printer.<br><br>Medical diagnostic instruments, namely, sample handlers, sample preparation equipment, equipment for testing bodily fluids for medical diagnosis. |
| ABBOTT | 3,842,269<br>(Aug. 31, 2010) | Computerized software programs for use in connection with a system for analyzing blood.<br><br>Blood analyzing instrument for medical diagnostic purposes and disposable cartridges and reagents for use therein.<br><br>Instruction manuals for use with a computerized blood analysis system consisting primarily of a portable blood analyzer, a computer, computer software and a portable printer. |

28)     Each of the Abbott Marks is a valid and enforceable trademark owned by Abbott. Further, each of the Abbott Marks is incontestable under federal law. The registration certificates for each of the Abbott Marks, and the declarations establishing their incontestability, are attached hereto as Exhibit A.

29)   The Abbott Marks, and the name of Abbott Laboratories, are derived from the surname of Wallace Abbott, a nineteenth-century Chicago physician who founded the company in 1888. For over 130 years, Abbott has been conducting business under this name in the United States and worldwide.

30)   Abbott operates its diverse divisions under the trusted Abbott name, across various sectors of the healthcare industry, including, for example, Abbott Nutrition, Abbott Molecular, Abbott Diabetes Care, and Abbott Diagnostics. It markets a diverse

array of well-known products such as Similac infant formula, nutritional products such as Ensure, diabetes care products, and pharmaceuticals. It is one of the world's most recognizable and trusted brands in any industry. Abbott was recently recognized on the Dow Jones Sustainability Index, one of the most prestigious global benchmarks for corporate sustainability, as a Global Industry Leader in sustainability for the seventh consecutive year. Fortune magazine has named Abbott as one of the World's Most Admired Companies every year since 1984. And just last year Abbott's FreeStyle Libre continuous glucose monitoring system received the highest award in its field, a top Galien Foundation prize that is the equivalent of the Nobel Prize in biopharmaceutical research.

31) The continuous use of the Abbott brand for more than a century has established Abbott as one of the world's leading healthcare brands, recognized by patients, health care professionals, and other users or consumers of Abbott products around the globe.

32) Abbott has invested significant time, effort, and money—indeed, millions of dollars—in developing and promoting its business under the Abbott Marks.

33) Abbott spends millions on advertising and advertises on hundreds of different media channels across multiple media formats, including digital media, print and television. Abbott's online marketing includes its own websites promoting the products, promoting the products on social media, and working with reporters in major media networks interested in covering the products. Abbott has registered and owns the domain name www.abbott.com, which is Abbott's home website and describes its global products and services, including diagnostic testing for diseases such as COVID-19.

34) Abbott specifically uses the Abbott Marks to promote and sell its COVID-19 tests. As with its other diagnostic products, Abbott has invested considerable resources toward marketing its COVID-19 diagnostics. Abbott's COVID-19 tests, in particular, have been the subject of considerable digital marketing efforts through social media, Abbott's website, news sites, and other avenues.

35)  Abbott also markets its diagnostic solutions through various sales channels. Abbott's sales organization, which comprises thousands of salespeople, is tasked with promoting and selling its diagnostic products. This salesforce uses Abbott's reputation as a trusted name in healthcare and medical diagnostics to promote and sell its products to a network of health clinics, hospitals, doctors' offices, public-sector healthcare consumers, and other end users. This salesforce has been mobilized and is currently devoted to selling Abbott's many authorized COVID-19 tests, both in the United States and abroad.

36)  The time, effort, and resources that Abbott has invested in marketing have made the Abbott Marks the gold standard for diagnostic solutions.

### Nana Yalley Is A Fly-By-Night Scam Artist

37)  The publicity and visibility of Abbott's success in the COVID-19 space has attracted imposters seeking to trade on Abbott's brand—including Defendants here.

38)  The following facts regarding CEO Nana Yalley are alleged on information and belief. Yalley is originally from Ghana and claims to have been educated in Norway and Sweden. He claims Ghanaian, European, and United States citizenship.

39)  Public records reflect that Yalley lived in or around Los Angeles as far back as the 1980s. He appears to have obtained a now-revoked license as a real estate agent in California in 1988.

40)  Public records also reflect that Yalley has lived in Florida—he bought property there in 2007, voted there in 2008, and was the defendant in a civil action involving a mortgage foreclosure in Miami-Dade County in 2009.

41)  Yalley holds himself out to the public as a legitimate businessman. His public resume reflects no prior experience in the medical or pharmaceutical industry prior to his current position as Abbot Genetics' CEO. He is not a doctor.

42)  For decades, Yalley has moved in and out of business ventures in a variety of economic sectors, leaving behind him a string of businesses that are now defunct, dissolved, or suspended. These no-longer-operative businesses were incorporated over the span of twenty years in the States of California and Nevada.

43)  Yalley's resume lists stints at companies called KTTV Fox 11 News, Nexcode, Inc., Priority Records, LLC, FOX International Channels, and N2 Growth. On information and belief, none of these companies sells medical diagnostics.

**Yalley's Company Exploits Abbott's Goodwill To Profit from a Global Pandemic**

44)  Defendants are opportunists trading on Abbott's valuable intellectual property to peddle their own competing products.

45)  Just as the scope of the pandemic was expanding, Abbot Genetics was created as a brand-new company. The domain for the company's website, www.abbotgenetics.com, was registered on March 3, 2020. The company was formally incorporated in the State of Delaware on March 30, 2020. In setting up its operation, Abbot Genetics brazenly stole Abbott's protected marks, copying Abbott's name but dropping a second and silent "t" from the end. Abbot Genetics registered itself to do business in California two months later, on June 1, 2020.

46)  Abbot Genetics' principal place of business is a mailbox drop location in Beverly Hills. The address provided on Abbot Genetics' website is a suite in a West Los Angeles office building. On information and belief, this same suite has served as the principal place of business for several other businesses associated with Abbot Genetics' CEO, Nana Yalley.

47)  The landing page of www.abbotgenetics.com bears the name "Abbot Genetics Inc" and provides an address. On the site, Abbot Genetics describes itself as an "early-stage," "U.S.-based" in vitro diagnostics company. The site touts "AG technology" that will be "essential in putting Americans back to work." It describes "POCT Rapid Serology Tests that deliver Fast, Scalable, Ease of Use Screening." The scientific-sounding jargon continues. Abbot Genetics claims that its tests deliver "aggressive population risk stratification" and provide "calibrated technologies for caregiver safety." One such statement is shown in the below screenshot from the homepage of Abbot Genetics' website, www.abbotgenetics.com:

> We are a U.S-based early-stage In Vitro Diagnostics
> Company on the front end of the fight to combat the
> ravaging effects of the coronavirus. AG technology will be
> essential in putting Americans back to work, providing post-
> pandemic COVID-19 antibody testing solutions to mitigate
> future outbreaks, and get Americans back to work.
> Learn More

48)     In other words, Abbot Genetics sells COVID-19 tests. Abbot Genetics markets these tests to health care providers through its website and other online marketing.

### Abbot Genetics' Far-Flung International Operations

49)     On information and belief, Abbot Genetics operates through a network of international personnel and partners.

50)     On information and belief, Abbot Genetics does not manufacture the COVID-19 tests it sells. Instead, Abbot Genetics sells tests that are manufactured by other companies.

51)     Abbott's investigation into Defendants' illegal conduct has uncovered limited but troubling details about Abbot Genetics' supply chain. For example, Abbot Genetics has entered an exclusive agreement with Jiangsu Dablood Pharmaceutical Co. Ltd. ("Dablood"), a China-based manufacturer of COVID-19 tests, to repackage that company's tests under the "Abbot Genetics" brand.

52)     Troublingly, however, Dablood's COVID-19 tests are not authorized for sale or distribution in the United States. Although Dablood's products were previously listed by FDA among manufacturers permitted to distribute based upon the manufacturer's notification to FDA, Dablood's product has since been removed from that list. According

to FDA, authorization may be revoked, among other reasons, due to "significant problems [with] a test that cannot be or have not been addressed in a timely manner." Here, FDA records reveal that the withdrawal of authorization was based upon concerns that the Dablood product might produce false positives.

53)     As of August 1, 2020, Abbot Genetics' website describes a new agreement with a COVID-19 test manufacturer called Beijing Wantai. Abbott's investigation has not confirmed whether Abbot Genetics now actually sells Beijing Wantai products. Abbot Genetics promotes its tests as FDA-approved.

54)     Abbott's ongoing investigation also suggests that Abbot Genetics is operating through a wide international sales and distribution network spanning multiple continents. On information and belief, Abbot Genetics distributes its products with the assistance of entities and personnel located abroad. Abbot Genetics is a signatory to a distribution agreement with an entity known as SunMed Biosciences, which, on information and belief, is a Hong Kong company.

55)     On information and belief, Abbot Genetics is also associated with Vinitori Comercializadora, S.A. de C.V. ("Vinitori"), a Mexican company, and its principal, Ricardo Baez Molina. Vinitori is also a signatory to the distribution agreement between Abbot Genetics and SunMed Biosciences. On information and belief, Vinitori and Baez Molina have a role in distributing and/or marketing COVID-19 tests in Mexico and South America under the "Abbot Genetics" name.

56)     On information and belief, Abbot Genetics also has officers who may reside abroad, including William Chan, who may reside in Hong Kong, and Antonio Carlos Pinto, who may reside in Sao Paolo.

## Abbot Genetics' Infringing COVID-19 Test

57)     Abbot Genetics' COVID-19 test is marketed and sold in packs of fifty, at prices that range between $1,100 and $1,500 approximately. The packaging for the tests displays the Abbot Genetics name and infringes the Abbott Marks:

- 14 -
COMPLAINT





The product logos reveal that Abbot Genetics has opted to use the same shade of blue that Abbott has been using as part of its look and feel since 2005.

58)     Inside the box, the tests themselves are confusingly similar to Abbott's genuine products. The graphic below compares Abbot Genetics' test cards to those for three Abbott products that are authorized for use in the U.S. or Europe:









59)     Abbot Genetics markets and sells its infringing tests through multiple channels, including through direct sales to healthcare companies and providers who contact Abbot Genetics, as well as through third-party sellers.

60)     On information and belief, Abbot Genetics' infringing products are also available for purchase to any consumer online through third-party websites.

61)     Defendant Abbot Genetics has sold its "Abbot"-branded COVID-19 diagnostic test across state lines, shipping tests from Los Angeles to one of Abbott's investigators in Miami.

62)   Similarities among these tests abound. All are COVID-19 tests. All are about the size of a credit card. All are branded on the outside with Abbott's name (one with, and one without, the second "t"). Both companies offer "lateral flow" tests, with a panel that reads the result through a testing strip, much the way an over-the-counter pregnancy test functions. All require the tester to apply a substrate to the testing strip—blood in Abbot Genetics' case, and either blood or another sample depending on which of Abbott's authorized tests is used. Abbott's product tests for past or present COVID-19 infection (searching for antibodies or antigens, depending on the product), and Abbot Genetics' purports to do the same (searching for antibodies). Abbott's test shows "positive" results with a horizontal line that appears across the test strip, and Abbot Genetics' product purports to provide results the same way.

**Defendants' Use of Abbott's Name Confuses and Harms the Public and Abbott**

63)     Abbot Genetics is not associated or affiliated with Abbott and has never been authorized or otherwise licensed by Abbott to use the Abbott Marks, nor any trade names or trademarks confusingly similar thereto, in connection with any goods or services.

64)     Abbot Genetics' use of the word "Abbot" on its COVID-19 tests, its website, and its marketing materials is confusingly similar to Abbott Laboratories' Abbott Marks in sight, sound, and commercial meaning.

65)     Abbott and Abbot Genetics sell their tests in the some of the same markets and to overlapping classes of consumers. This includes selling directly to healthcare providers such as hospitals, clinics, doctors, and nurses.

66)     Both companies also sell to other types of persons who administer COVID-19 tests. For example, Abbott sells to public and private entities that have a healthcare function or have healthcare personnel. Meanwhile, Abbot Genetics sells its products via online retailers, where, on information and belief, anyone with an internet browser can buy them.

67)     Defendants' use of the name "Abbot" in connection with the marketing and sale of rapid lateral-flow COVID-19 tests will confuse health professionals and other consumers, leading them to believe that Defendants are, or are an extension of, or are associated with Abbott, and that Defendants' products come from, or are affiliated with, or are endorsed or sponsored by Abbott.

68)     Defendants' use of the "Abbot" name on COVID-19 tests irreparably harms the reputation and goodwill that Abbott has worked to build. Among other things, Defendants have distributed tests with an FDA mark on the packaging and on information and belief may be continuing to do so despite having lost FDA authorization.

69)     Abbot Genetics' use of the Abbott Marks is intended to confuse consumers.

70)     Upon information and belief, Defendants selected and have used the "Abbot" name with actual and constructive knowledge of Abbott's ownership of and exclusive rights to use the Abbott Marks and with the intent to trade off of the significant goodwill symbolized by the strong industry recognition of the Abbott Marks.

71)     Defendant Abbot Genetics, and Defendant Yalley as an officer of Abbot Genetics, are aware that there is a high likelihood of confusion arising from their use of the "Abbot" name.

**FIRST CLAIM FOR RELIEF:**
**Infringement of Registered Trademark Under**
**Section 32 of the Lanham Act, 15 U.S.C. § 1114**

72)  Abbott repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

73)  Abbott owns the Abbott Marks, which are federally registered and have been declared incontestable. The Abbott Marks are valid, subsisting, used in commerce, and inherently distinctive.

74)  Defendants' mark uses the Abbott Marks and is confusingly similar to the Abbott Marks.

75)  Defendants' use of the Abbott Marks is likely to cause confusion. Health care providers and individual consumers seeking reputable, FDA-authorized, lateral flow COVID-19 tests in the midst of a pandemic during which testing shortages, delays, and uncertainty are common likely will believe Abbot Genetics' tests (which are marketed as FDA-approved) are sponsored by, associated with, or otherwise affiliated with Abbott.

76)  Defendants' use of the Abbott Marks is likely to cause irreparable injury to the name and reputation of Abbott, as well as to the goodwill carefully cultivated by Abbott. The extent of this harm cannot be quantified, leaving Abbott with no adequate remedy at law.

77)  Defendants' use of the Abbott Marks constitutes infringement of the registered Abbott Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

78)  By reason of the foregoing, Abbott is entitled to temporary and permanent injunctive relief against Defendants restraining them from any further acts of trademark infringement and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts, trebled, disgorgement of their profits derived from Defendants' aforesaid acts, and attorneys' fees.

## SECOND CLAIM FOR RELIEF:
### False Designation of Origin and Unfair Competition Under
### Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

79)   Abbott repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

80)   The Abbott Marks are inherently distinctive.

81)   As noted above, Defendants' mark, which has been promoted, distributed, and used in commerce, is confusingly similar to the Abbott Marks. Defendants' use of the Abbott Marks will imply that its apparently unauthorized COVID-19 tests come from the same source as Abbott's FDA-authorized COVID-19 tests. Such implications are false, confusing, and material to consumers' purchasing decisions.

82)   Defendants' unauthorized use of the Abbott Marks in connection with the promotion or sale of their unauthorized COVID-19 test products falsely suggests that these tests are connected with, sponsored by, affiliated with, or related to Abbott.

83)   Defendants' unauthorized use of the Abbott Marks constitutes a false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

84)   Defendants' conduct has damaged Abbott and, unless enjoined by the Court, will further impair the value of Abbott's name, reputation, and goodwill.  This harm constitutes an injury for which Abbott has no adequate remedy at law.

85)   By reason of the foregoing, Abbott is entitled to temporary and permanent injunctive relief against Defendants restraining them from any further acts of false designation of origin and unfair competition and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts, trebled, disgorgement of their profits derived from Defendants' aforesaid acts, and attorneys' fees.

### THIRD CLAIM FOR RELIEF:
### <u>Cybersquatting Under</u>
### <u>Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d)</u>

86)     Abbott repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

87)     Defendants have caused to be registered, registered, maintained the registration of, and/or used the domain name <abbotgenetics.com> with a bad-faith intent to profit from the Abbott Marks.

88)     Abbott owns the Abbott Marks, which are federally registered and has been declared incontestable. The Abbott Marks are valid, subsisting, used in commerce, and inherently distinctive.

89)     Abbott's Abbott trademarks were registered and declared incontestable long before Defendants registered the <abbotgenetics.com> domain name on March 3, 2020.

90)     The <abbotgenetics.com> domain name is substantially indistinguishable and confusingly similar to the Abbott Marks.

91)     The aforementioned acts of Defendants constitute cybersquatting in violation of 15 U.S.C. § 1125(d).

92)     By reason of the foregoing, Abbott is entitled to preliminary and permanent injunctive relief against Defendants, restraining them from any further acts of cybersquatting and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts, trebled, disgorgement of their profits derived from Defendants' aforesaid acts, or statutory damages, and attorneys' fees, and to have the domain name <abbotgenetics.com> forfeited, cancelled, or transferred to Abbott.

## FOURTH CLAIM FOR RELIEF:
### Counterfeiting of Registered Trademark Under
### Section 32 & 35 of the Lanham Act, 15 U.S.C. §§ 1114, 1117

93)     Abbott repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

94)     Abbott owns the Abbott Marks, which are federally registered and has been declared incontestable, and has been used in interstate commerce. The Abbott Marks are valid, subsisting, used in commerce, and inherently distinctive. The Abbott trademark registration specifically covers, among other things, medical diagnostic apparatus used to detect the level of substances in body fluids.

95)     Abbott has prior rights to Defendants in and to the Abbott Marks in the United States.

96)     Defendants' use of Abbott Marks is substantially indistinguishable to Abbott's registered Abbott Marks in spelling, appearance, sound, and commercial impression, and is used by Defendants in connection with identical products.

97)     Defendants' use of the Abbott Marks is a spurious attempt to pass off its unauthorized COVID-19 tests as those of Abbott, and therefore is a counterfeit mark in violation of Section 35 of the Lanham Act, 15 U.S.C. § 1117.

98)     By reason of the foregoing, Abbott is entitled to preliminary and permanent injunctive relief against Defendants, restraining them from any further acts of trademark counterfeiting and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts, trebled, disgorgement of their profits derived from Defendants' aforesaid acts, trebled or statutory damages, and attorneys' fees.

## FIFTH CLAIM FOR RELIEF:
### Trademark Infringement and Unfair Competition
### Under California Common Law

99)   Abbott repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

100)   The aforementioned acts of Defendants constitute trademark infringement, cybersquatting, counterfeiting and unfair competition in violation of California law.

101)   Defendants' conduct has damaged Abbott and will, unless enjoined by the Court, further impair the value of Abbott's name, reputation, and goodwill. This harm constitutes an injury for which Abbott has no adequate remedy at law.

102)   Defendants, in undertaking the conduct described herein, have acted maliciously, wantonly, or oppressively.

103)   By reason of the foregoing, Abbott is entitled to preliminary and permanent injunctive relief against Defendants, restraining them from any further acts of trademark infringement and, after trial, to recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts, and to punitive damages.

## SIXTH CLAIM FOR RELIEF:
### Unfair Competition Under
### Cal Bus. & Prof. Code §§ 17200 *et seq.*

104)   Abbott repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

105)   California's Unfair Competition Law ("UCL"), Business & Professions Code §§ 17200, et seq., prohibits any unlawful, unfair, or fraudulent business act or practice, and unfair, deceptive, untrue or misleading advertising.

106)   The aforementioned acts of Defendants constitute unfair competition in violation of the UCL.

107)   Defendants' conduct has damaged Abbott and will, unless enjoined by the Court, further impair the value of Abbott's name, reputation, and goodwill. This harm constitutes an injury for which Abbott has no adequate remedy at law.

108)   By reason of the foregoing, Abbott is entitled to preliminary and permanent injunctive relief against Defendants, restraining them from any further acts of trademark infringement, and after trial, to recovery of any restitution damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts.

**PRAYER FOR RELIEF**

WHEREFORE, Abbott demands trial by jury, and respectfully prays:

1.   That Defendants and all those in active concert or participation with them (including, but not limited to, each of their respective officers, directors, agents, principals, servants, wholesalers, distributors, suppliers, retailers, employees, representatives, attorneys, subsidiaries, related companies, affiliates, successors, assigns, contracting parties, as well other associated entities using the Abbott Marks with only one "t") be preliminarily and permanently enjoined from:

   (a)   using anywhere in the world the Abbott Marks or any other mark, name or designation that is confusingly similar to the Abbott Marks, including, but not limited to, on any product, marketing materials, websites, and/or social media platforms; and

   (b)   registering, trafficking in, or using a domain name that is identical or confusingly similar to the Abbott Marks, including but not limited to www.abbotgenetics.com; and

   (c)   representing, by any means whatsoever, that any products manufactured, distributed, advertised, offered, or sold by Defendants are Abbott's product, or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of consumers, including but not limited to healthcare providers, as to the

origin or sponsorship of such products, or engaging in any further acts of infringement of the Abbott Marks.

2. That Defendants be prohibited from assisting, aiding, or abetting any other person or business entity from engaging in the acts set forth above, including by effecting any assignment or transfer or forming new entities or associations.

3. That Defendants and all those in active concert or participation with them (including, but not limited to, each of their respective officers, directors, agents, principals, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, affiliates, successors, assigns, and contracting parties, as well other associated entities using the Abbott Marks with only one "t") take affirmative steps to dispel such false impressions that heretofore have been created by their use of the Abbott Marks, including, but not limited to, recalling from any and all channels of trade any and all infringing goods or services, including but not limited to any diagnostic tests for COVID-19 bearing the name "Abbot Genetics."

4. That Defendants transfer to Abbott the <abbotgenetics.com> domain name and all other domain names it owns or controls that contain or are confusingly similar to the Abbott Marks, or, in the alternative, that such domain names be forfeited or cancelled pursuant to 15 U.S.C. § 1125(d).

5. That Defendants account to Abbott for their profits and any damages sustained by Abbott, to the extent calculable, arising from the foregoing acts of trademark infringement, counterfeiting, false designation of origin, and deceptive acts and practices in the United States.

6. That, in accordance with such accounting, Abbott be awarded judgment for such profits or damages (whichever is greater), and a trebling of such award, pursuant to 15 U.S.C. § 1117 and California law.

7.     That, pending such accounting and/or an award of damages, Defendants be directed to preserve all assets and funds held in any bank or other financial account owned or controlled by Abbot Genetics and not to transfer, encumber, liquidate, pledge, loan, conceal, disburse, spend, withdraw, or otherwise dispose of such funds.

8.     That Abbott be awarded all other appropriate monetary relief, including without limitation, and if elected by Abbott, statutory damages for use of a counterfeit mark and for cybersquatting, pursuant to 15 U.S.C. § 1117.

9.     That Abbott be awarded punitive damages pursuant to California law in view of Defendants' intentional and willful trademark infringement and other conduct.

10.    That Abbott have and recover its costs, including its reasonable attorneys' fees and disbursements in this action, pursuant to 15 U.S.C. § 1117 and California law.

11.    That Abbott be awarded prejudgment and post-judgment interest.

12.    That Defendants file with the Court and serve on counsel for Abbott within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to 15 U.S.C. § 1116(a) setting forth in detail the manner and form in which Defendants have complied with any injunction which the Court may enter in this action.

13.    That Abbott receive such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Abbott Laboratories hereby demands trial by jury in this action.

DATED: September 14, 2020

Respectfully submitted,

CONRAD & METLITZKY LLP

_with express permission_

WARREN METLITZKY
ELLEN RICHMOND
MIGUEL GRADILLA
Attorneys for Plaintiff Abbott Laboratories

# Exhibit A



# United States of America
## United States Patent and Trademark Office

# ABBOTT

**Reg. No. 4,023,123**

**Registered Sep. 6, 2011**

**Int. Cls.: 1, 5, 9, 10, and 44**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

ABBOTT LABORATORIES (ILLINOIS CORPORATION)
100 ABBOTT PARK ROAD
ABBOTT PARK, IL 60064

FOR: CHEMICAL REAGENTS, NAMELY, REAGENT STRIPS FOR BODY FLUID TESTING FOR USE IN THE SCIENTIFIC RESEARCH INDUSTRY; CONTROL SOLUTIONS AND CONTROL REAGENTS FOR USE WITH SCIENTIFIC APPARATUS AND INSTRUMENTS FOR QUALITY CONTROL AND CALIBRATION PURPOSES, IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

FIRST USE 5-31-2005; IN COMMERCE 5-31-2005.

FOR: CHEMICAL REAGENTS, NAMELY, DIAGNOSTIC MEDICAL REAGENT STRIPS FOR USE BY INDIVIDUALS TO TEST THEIR OWN BODY FLUIDS AND FOR USE BY THE MEDICAL PROFESSION, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 9-30-2005; IN COMMERCE 9-30-2005.

FOR: COMPUTER COMMUNICATIONS HARDWARE FOR CONNECTION TO A MEDICAL TEST INSTRUMENT DATA STORAGE MEMORY AND TO A COMPUTER FOR DOWN-LOADING STORED DATA TO THE COMPUTER AND COMPUTER SOFTWARE, SOLD THEREWITH, FOR DISPLAYING THE DOWNLOADED DATA; COMPUTER SOFTWARE USED TO MANAGE POINT OF CARE DIAGNOSTIC INSTRUMENT TEST RESULTS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 12-31-2006; IN COMMERCE 12-31-2006.

FOR: MEDICAL DIAGNOSTIC APPARATUS USED TO DETECT AND MEASURE THE LEVEL OF SUBSTANCES IN BODY FLUIDS; LANCES, LANCETS AND LANCING DEVICES AND BODY FLUID MONITORING, DIAGNOSTIC AND TESTING APPARATUS AND IN-STRUMENTS AND DIAGNOSTIC KITS CONTAINING TEST STRIPS, TEST METER AND CONTROL SOLUTIONS; APPARATUS FOR MEASURING DOSAGES AND DELIVERING PHARMACEUTICALS, NAMELY, MEDICAL PUMPS AND PENS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 11-2-2008; IN COMMERCE 11-2-2008.



David J. Kappos

Director of the United States Patent and Trademark Office

**Reg. No. 4,023,123** FOR: ON-LINE HEALTH AND MEDICAL SERVICES, NAMELY, PROVIDING AN INTER-
ACTIVE DATABASE FOR EXCHANGE OF INFORMATION BETWEEN A MEDICAL DEVICE
USER AND HEALTHCARE PROVIDERS, DELIVERED VIA A GLOBAL COMPUTER NET-
WORK, IN CLASS 44 (U.S. CLS. 100 AND 101).

FIRST USE 12-31-2006; IN COMMERCE 12-31-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

SEC. 2(F).

OWNER OF U.S. REG. NOS. 737,430, 740,515, AND 1,910,664.

SN 77-614,497, FILED 11-14-2008.

THEODORE MCBRIDE, EXAMINING ATTORNEY

Page: 2 / RN # 4,023,123

Exhibit A
29

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Friday, March 16, 2018 11:01 PM |
| **To:** | trademarks@abbott.com |
| **Subject:** | Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 4023123: ABBOTT: Docket/Reference No. T54978 |

**U.S. Serial Number:** 77614497
**U.S. Registration Number:** 4023123
**U.S. Registration Date:** Sep 6, 2011
**Mark:** ABBOTT
**Owner:** Abbott Laboratories

Mar 16, 2018

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065. **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
001, 005, 009, 010, 044

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date. See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=77614497&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=77614497&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

Exhibit A



# ABBOTT

**Reg. No. 3,842,268**   ABBOTT LABORATORIES (ILLINOIS CORPORATION)
                         100 ABBOTT PARK ROAD
**Registered Aug. 31, 2010**  ABBOTT PARK, IL 60064

**Int. Cls.: 1, 5, 9, and 10**   FOR: REAGENTS FOR SCIENTIFIC AND MEDICAL RESEARCH USE; GENETIC DIAGNOST-
                                 IC KITS COMPOSED OF DNA PROBES, REAGENTS AND ANTIBODIES FOR SCIENTIFIC
                                 RESEARCH, IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

**TRADEMARK**

**PRINCIPAL REGISTER**     FIRST USE 7-31-2007; IN COMMERCE 7-31-2007.

FOR: MEDICAL DIAGNOSTIC REAGENTS; GENETIC DIAGNOSTIC KITS COMPOSED OF
DNA PROBES, DETECTION REAGENTS AND ANTIBODIES FOR USE IN CLINICAL
MEDICINE, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 7-31-2007; IN COMMERCE 7-31-2007.

FOR: INTEGRATED SYSTEM COMPRISED OF A COMPUTER, COLOR MONITOR, OPTICAL
DISK DRIVE AND PHOTOGRAPHIC PRINTER , IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND
38).

FIRST USE 12-31-2005; IN COMMERCE 12-31-2005.

FOR: MEDICAL DIAGNOSTIC INSTRUMENTS, NAMELY, SAMPLE HANDLERS, SAMPLE
PREPARATION EQUIPMENT, EQUIPMENT FOR TESTING BODILY FLUIDS FOR MEDICAL
DIAGNOSIS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 12-31-2007; IN COMMERCE 12-31-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

SEC. 2(F).

OWNER OF U.S. REG. NOS. 737,430, 740,515, AND 1,910,664.

SN 77-614,039, FILED 11-13-2008.

THEODORE MCBRIDE, EXAMINING ATTORNEY

Director of the United States Patent and Trademark Office

**From:**       TMOfficialNotices@USPTO.GOV
**Sent:**       Monday, November 7, 2016 11:00 PM
**To:**         trademarks@abbott.com
**Subject:**    Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 3842268: ABBOTT: Docket/Reference No. 4978103

**Serial Number:**  77614039
**Registration Number:**  3842268
**Registration Date:**  Aug 31, 2010
**Mark:**  ABBOTT
**Owner:**  Abbott Laboratories

Nov 7, 2016

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058.  **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065.  **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below for the remainder of the ten-year period, calculated from the registration date, unless canceled by an order of the Commissioner for Trademarks or a Federal Court.**

**Class(es):**
001, 005, 009, 010

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date.  See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*The USPTO WILL NOT SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE REGISTRANT SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To view this notice and other documents for this application on-line, go to http://tdr.uspto.gov/search.action?sn=77614039.  NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

Exhibit A
32



# ABBOTT

**Reg. No. 3,842,269**
**Registered Aug. 31, 2010**

ABBOTT LABORATORIES (ILLINOIS CORPORATION)
100 ABBOTT PARK ROAD
ABBOTT PARK, IL 60064

**Int. Cls.: 9, 10, and 16**

FOR: COMPUTERIZED SOFTWARE PROGRAMS FOR USE IN CONNECTION WITH A SYSTEM FOR ANALYZING BLOOD, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

**TRADEMARK**

FIRST USE 12-31-1992; IN COMMERCE 12-31-1992.

**PRINCIPAL REGISTER**

FOR: BLOOD ANALYZING INSTRUMENT FOR MEDICAL DIAGNOSTIC PURPOSES AND DISPOSABLE CARTRIDGES AND REAGENTS FOR USE THEREIN, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 3-31-1999; IN COMMERCE 3-31-1999.

FOR: INSTRUCTION MANUALS FOR USE WITH A COMPUTERIZED BLOOD ANALYSIS SYSTEM CONSISTING PRIMARILY OF A PORTABLE BLOOD ANALYZER, A COMPUTER, COMPUTER SOFTWARE AND A PORTABLE PRINTER, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 12-31-1992; IN COMMERCE 12-31-1992.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SEC. 2(F).

OWNER OF U.S. REG. NOS. 737,430, 740,515, AND 1,910,664.

SN 77-614,045, FILED 11-13-2008.

THEODORE MCBRIDE, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Tuesday, November 8, 2016 11:00 PM |
| **To:** | trademarks@abbott.com |
| **Subject:** | Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 3842269: ABBOTT: Docket/Reference No. 4978104 |

**Serial Number:**  77614045
**Registration Number:**  3842269
**Registration Date:**  Aug 31, 2010
**Mark:**  ABBOTT
**Owner:**  Abbott Laboratories

Nov 8, 2016

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058.  **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065.  **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below for the remainder of the ten-year period, calculated from the registration date, unless canceled by an order of the Commissioner for Trademarks or a Federal Court.**

**Class(es):**
009, 010, 016

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

#### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date.  See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*The USPTO WILL NOT SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE REGISTRANT SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To view this notice and other documents for this application on-line, go to http://tdr.uspto.gov/search.action?sn=77614045.  NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

Exhibit A
34