CLERK, U.S. DISTRICT COURT

SEP 14 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____RS_____ DEPUTY

WARREN METLITZKY (CA Bar No. 220758)
Email:      wmetlitzky@conradmetlitzky.com
ELLEN RICHMOND (CA Bar No. 277266)
Email:      erichmond@conradmetlitzky.com
MIGUEL GRADILLA (CA Bar No. 304125)
Email:      mgradilla@conradmetlitzky.com
**CONRAD & METLITZKY LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel:   (415) 343-7100
Fax:   (415) 343-7101

Attorneys for Plaintiff
ABBOTT LABORATORIES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABBOTT LABORATORIES, <br><br> Plaintiff, <br><br> v. <br><br> ABBOT GENETICS INC., et al., <br><br> Defendants. | CASE NO.  2:20-CV-08403-ODW-PLAx <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** <br><br> **[FILED UNDER SEAL]**[1] |

---

[1] Pursuant to Local Rule 79-5.2.1(b), a motion to file this action temporarily under seal is filed concurrently herewith. Plaintiff asks that the case be filed under seal temporarily, until after the Court has ruled on the instant *ex parte* application for a temporary restraining order, so as not to alert the Defendants or other involved parties to the filing of this civil action or to Plaintiff's request for an asset freeze.

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................- 1 -

FACTUAL BACKGROUND ...........................................- 2 -

   I.   Abbott Is One Of The World's Leading Healthcare Companies .....- 2 -

   II.   Abbott Is At The Vanguard Of The Global Battle Against Coronavirus .......................................................- 3 -

   III.   Abbott's Binaxnow® COVID-19 Test Is A "Game-Changer".........- 4 -

   IV.   Abbott Uses Protected Trademarks To Sell COVID-19 Tests ........- 5 -

   V.   Abbott Has Earned Wide Notoriety As A Brand To Trust In COVID-19 .........................................................- 6 -

   VI.   Abbot Genetics Is A Pandemic Opportunist .....................- 6 -

   VII.   Abbot Genetics' Infringement May Spread Through A Web Of International Collaborators...............................- 7 -

   VIII.   Abbot Genetics' Products Are On FDA's "Do Not Distribute" List- 8 -

   IX.   Abbot Genetics' CEO Nana Yalley Is A Fly-By-Night Scam Artist- 8 -

   X.   Abbot Genetics' Unreliable Tests Are Similar To Abbott's Trusted Ones ........................................................- 10 -

LEGAL STANDARD ....................................................- 12 -

ARGUMENT ...........................................................- 13 -

   I.   Abbott Is Likely To Succeed On The Merits Of Its Claims .........- 13 -

      A.   Abbott Is Likely To Succeed On Its Infringement, False Designation, and Unfair Competition Claims.....................- 13 -

      B.   Abbott Is Likely to Succeed on Its Cybersquatting Claim ..- 18 -

   II.   Abbott Will Suffer Irreparable Harm Absent TRO Relief.............- 19 -

   III.   The Public Interest And The Balance Of Equities Favor A Restraining Order.......................................................- 21 -

   IV.   A Narrow And Temporary Asset Freeze Is Warranted.................- 22 -

   V.   Abbott Should Not Be Required To Post A Bond .........................- 23 -

CONCLUSION .........................................................- 25 -

# **TABLE OF AUTHORITIES**

**Page**

**CASES**

*3 Phases, LLC v. Parker*,
    No. CV 09-2331 SVW, 2009 WL 10669748 (C.D. Cal. May 27, 2009) ................... 24

*3M Co. v. Performance Supply, LLC*,
    No. 20-CIV-02949-LAP-KNF, --- F. Supp. 3d ----, 2020 WL 2115070
    (S.D.N.Y. May 4, 2020)................................................................................ 16, 21

*All. For Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................................ 12

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979): (1) ................................................................ 14, 15, 18

*Apple Computer, Inc. v. Franklin Computer Corp.*,
    714 F.2d 1240 (3rd Cir. 1983) ................................................................................ 21

*Avila v. Stearns Lending, Inc.*,
    No. CV 08-0919-AG, 2008 WL 1378231 (C.D. Cal. Apr. 7, 2008) .......................... 24

*Boldface Licensing + Branding v. By Lee Tillett, Inc.*,
    940 F. Supp. 2d 1178 (C.D. Cal. 2013) .................................................................. 19

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ................................................................................ 16

*BYD Co. Ltd v. Khazai*,
    No. CV 20-5530-DMG, 2020 WL 3893310 (C.D. Cal. July 10, 2020) ..................... 21

*Chloe SAS v. Sawabeh Info. Servs. Co.*,
    No. CV 11-04147 GAF, 2011 WL 13130013 (C.D. Cal. May 17, 2011) ................... 22

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) .................................................................................. 24

*Datatech Enters. v. FF Magnat Ltd.*,
  No. C 12-04500 CRB, 2012 WL 4068624 (N.D. Cal. Sept. 14, 2012)................22, 23

*DSPT Int'l, Inc. v. Nahum*,
  624 F.3d 1213 (9th Cir. 2010) ..........................................................................18, 19

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ................................................................................15

*FAZE Apparel, LLC v. Faze Clan, Inc.*,
  No. 2:18-CV-02052-RGK-JEM, 2018 WL 3830027 (C.D. Cal. May 22,
  2018) .......................................................................................................................13

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
  930 F.2d 277 (3d Cir. 1991) ...................................................................................14

*Gorbach v. Reno*,
  219 F.3d 1087 (9th Cir. 2000) ................................................................................24

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................................15

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*,
  736 F.3d 1239 (9th Cir. 2013) ................................................................................12

*Hero Nutritionals LLC v. Nutraceutical Corp.*,
  No. SACV 11-1195, 2012 WL 12888838 (C.D. Cal. Oct. 30, 2012) .........................16

*Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*,
  425 F.3d 708 (9th Cir. 2005) ..................................................................................21

*Innersvingen AS v. Sports Hoop, Inc.*,
  No. CV 12-05257 R (JCGx), 2012 WL 3048363 (C.D. Cal. July 26,
  2012) .......................................................................................................................24

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ...........................................................................22, 24

*JOL Mgmt. Co. v. Polycell Nutraceuticals, Inc.*,
  No. CV 08-198, 2008 WL 11334472 (C.D. Cal. Aug. 18, 2008) ...............................16

iii

*Kythera Biopharms., Inc. v. Lithera, Inc*,
  998 F. Supp. 2d 890 (C.D. Cal. 2014) ....................................................... 13

*Lions Gate Films Inc. v. Does*,
  No. 2:14-CV-06033-MMM, 2014 WL 3895240 (C.D. Cal. Aug. 8, 2014) ............ 8, 22

*Louis Vuitton Malletier and Oakley, Inc. v. Veit*,
  211 F. Supp. 2d 567 (E.D. Pa. 2002) ........................................................ 19

*Microsoft Corp. v. A-Tech Corp.*,
  855 F. Supp. 308 (C.D. Cal. 1994) ........................................................... 22

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*,
  230 F. Supp. 3d 1161 (C.D. Cal. 2017) ................................................. 18, 19

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ................................................................. 14

*Ossur HF v. Manamed Inc.*,
  331 F. Supp. 3d 1005 (C.D. Cal. 2017) ........................................... 13, 15, 18

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
  897 F.3d 1008 (9th Cir. 2018) ................................................................. 13

*Palantir Techs. Inc. v. Palantir.net, Inc.*,
  No. C 07-03863 CRB, 2008 WL 152339 (N.D. Cal. Jan. 15, 2008) ................... 17

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ....................................................... 14, 15, 17

*Rearden LLC v. Rearden Commerce, Inc.*,
  683 F.3d 1190 (9th Cir. 2012) ................................................................. 14

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
  970 F.2d 552 (9th Cir. 1992) ................................................................... 22

*Robinson v. Delicious Vinyl Records Inc.*,
  No. CV 13-4111-CAS, 2013 WL 3983014 (C.D. Cal. Aug. 1, 2013) .................. 13

CASE NO. _____                                      MPA ISO EX PARTE APP. FOR TRO

*Rolex Watch U.S.A., Inc. v. Agarwal*,
    No. 12-cv-06400-MRW, 2012 WL 12886444 (C.D. Cal. Dec. 17, 2012).................18

*SATA GmbH & Co. Kg v. Wenzhou New Cent. Int'l, Ltd.*,
    No. 15-08157, 2015 WL 6680807 (C.D. Cal. Oct. 19, 2015) ......................................22

*Stone Brewing Co., LLC v. MillerCoors LLC*,
    445 F. Supp. 3d 1113 (S.D. Cal. 2020).......................................................................14

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ......................................................................................19

*Super-Krete Int'l, Inc. v. Sadleir*,
    712 F. Supp. 2d 1023 (C.D. Cal. 2010) .......................................................................19

*Syntex Labs., Inc. v. Norwich Pharmacal Co.*,
    437 F.2d 566 (2d Cir. 1971) .......................................................................................17

*United Artists Corp. v. United Artist Studios LLC*,
    No. CV 19-828-MWF, 2019 WL 3293650 (C.D. Cal. June 3, 2019) ..........................21

*Van De Kamp v. Tahoe Reg'l Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985) ....................................................................................24

*Vertos Med., Inc. v. Globus Med., Inc.*,
    No. C 09-1411 PJH, 2009 WL 3740709 (N.D. Cal. Nov. 6, 2009) .............................18

*Volkswagen AG v. Verdier Microbus & Camper*,
    No. C 09-00231 JSW, 2009 WL 928130 (N.D. Cal. Apr. 3, 2009) .............................17

*Walczak v. EPL Prolong, Inc.*,
    198 F.3d 725 (9th Cir. 1999) ......................................................................................24

*Walter v. Mattel, Inc.*,
    210 F.3d 1108 (9th Cir. 2000) ....................................................................................13

*Warner Bros. Entm't, Inc. v. WTV Sys.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ......................................................................21

    

*Warner Bros. Entm't v. Glob. Asylum, Inc.*,
    No. CV 12-9547 PSG, 2013 WL 12114836 (C.D. Cal. Jan. 29, 2013).......................24

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    758 F.3d 1069 (9th Cir. 2014) .......................17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................12, 19

STATUTES

15 U.S.C. §§ 1115(b), 1065 .......................14

15 U.S.C. § 1117(a) .......................22

15 U.S.C. § 1125(d)(1)(A) .......................18

15 U.S.C. § 1125(d)(1)(b)(i) .......................19

Lanham Act.......................13, 18

OTHER AUTHORITIES

5 McCarthy on Trademarks and Unfair Competition § 25A:51.......................18

Fed. R. Civ. P. 65(b)(1)(A) .......................12

Federal Rule of Civil Procedure 65(c) .......................24

CASE NO. _____                                                                    MPA ISO EX PARTE APP. FOR TRO

## MEMORANDUM OF POINTS AND AUTHORITIES

The COVID-19 pandemic—which to date has infected over 6 million Americans and killed over 190,000—rages throughout the United States. In the midst of this crisis, Plaintiff Abbott Laboratories ("Abbott") comes before this Court on an emergency basis to stop a scheme perpetrated by Defendant Abbot Genetics Inc. ("Abbot Genetics"). Specifically, Abbott Laboratories (two "t"s) seeks an order restraining Abbot Genetics (one "t") from deceiving the public by passing off its own infringing COVID-19 tests, including tests delisted by the U.S. Food and Drug Administration ("FDA"), under Abbott's valuable trademarks. FDA has instructed that tests at issue should not be used due to reliability issues, and the Court should act to ensure that these tests do not enter widespread distribution. Abbott also requests an asset freeze and an accounting to ensure that the defendants, a six-month-old corporation and its fly-by-night "Chief Executive Officer," do not abscond with their ill-gotten gains. Emergency relief is necessary to halt Defendants' efforts to enrich themselves at the expense of public health and to trade unlawfully on one of the most reliable and trusted brands in healthcare.

## INTRODUCTION

Since the COVID-19 pandemic began, diagnostic testing has emerged as the critical tool in the fight to detect and combat the virus. Just a few major companies lead the worldwide effort to develop these critical tests. Both the public and the government have turned to these select few companies for help in ending this crisis.

Plaintiff Abbott Laboratories ("Abbott") is one of those companies. For decades, Abbott has been recognized throughout the country and the world for its leadership in diagnostics. Now Abbott has risen to the fore in taking on COVID-19. Starting in March 2020, Abbott gained the first in its long line of regulatory authorizations for trusted COVID-19 tests. The FDA alone has authorized *six* such tests, and Abbott has already shipped tens of millions of them.

In the wake of Abbott and its peers comes a stream of imposters looking for a quick profit. Abbot Genetics (one "t") is one of *those* companies. Formed mid-pandemic,

Abbot Genetics' entire business is to profit off the value of Abbott's name. Unlike Abbott's scientists, Abbot Genetics' "CEO" Nana Yalley has no medical training. Rather than a regulatory track record, Yalley's resume is full of failed and abandoned businesses from agronomy to "video streaming." Yalley and Abbot Genetics are now hawking COVID-19 tests, including tests the FDA has determined do not work properly, by slapping on Abbott's name without the second, silent "t". Yalley's hope, apparently, is to benefit as much as possible from Abbott's reputation and consumers' fear and panic before he moves on, as he has done so many times before.

The Court should take action to protect public health, consumers, and Abbott from Defendants' unlawful conduct. Abbott moves the Court to issue: (1) a temporary restraining order to enjoin Defendants' blatant infringement; (2) an order freezing specific assets (a bank account with ill-gotten profits) to preserve meaningful relief on Abbott's clear infringement claims; (3) an order directing an accounting with respect to that bank account; (4) an order transferring ownership over an infringing website domain; and (5) an order to show cause why Defendants' conduct should not be preliminarily enjoined. By separate motion, Abbott also seeks leave to propound limited early discovery, including a limited deposition of Abbot Genetics, so that it may take action against others who are participating in and profiting from Defendants' scheme.

FACTUAL BACKGROUND

## I.      Abbott Is One of the World's Leading Healthcare Companies

Founded in 1888, Abbott's history spans more than a century of continuous operation. Godon Decl. ¶ 4. Abbott employs more than 100,000 people. *Id*. ¶ 5. It operates in 160 countries around the globe and specializes in diagnostics, medical devices, and nutritional products. *Id.* It operates many diverse divisions under the trusted Abbott name across various sectors of the healthcare industry. Abbott Nutrition, Abbott Diabetes Care, and Abbott Diagnostics are just a few examples. *Id.*

Most important here, Abbott has a rich legacy of innovation in medical testing, or "diagnostics." *Id.* ¶ 6. Abbott launched its first hepatitis test in 1972 and has gone on to

produce products that have met some of the world's biggest health challenges. In the throes of the 1980s HIV/AIDS crisis, for example, Abbott developed the first test to detect HIV in blood supply. *Id*. ¶ 8.d. It has since collected one of the world's largest viral sample libraries and has developed diagnostics that screen 60 percent of the world's blood supply. *Id*. ¶ 8.c. More than 60 million tests are run on Abbott instruments worldwide every day. *Id*. ¶ 6.

Abbott is a recognized leader in point-of-care testing—that is, developing and distributing tests given at the time and place a patient is seen. *Id*. ¶ 7. In 2019 alone, Abbott delivered more than *one billion* point-of-care tests to healthcare professionals and patients around the globe. *Id.*

## II.   Abbott Is At the Vanguard of the Global Battle Against Coronavirus

Abbott is at the vanguard of the fight against the virus. Leveraging decades of experience in medical diagnostic innovation, it has developed and brought to market test after test for detecting COVID-19 and the antibodies that form during the immune response. To do so, Abbott adapted its existing test platforms, including the Alinity, m2000, and ID NOW test processing systems, which were already in use to test for other diseases. Building upon these existing platforms, which represent decades of diagnostic expertise and millions in research and development, Abbott was able to move quickly to meet the challenge of COVID-19.

As the virus took off around the world, Abbott moved right away to develop and release COVID-19 tests. Its efforts have produced a steady succession of highly touted regulatory authorizations. First, in March 2020, it released the first of its U.S.-authorized *molecular diagnostic* tests designed to detect the presence of the COVID-19 virus itself. Drysdale Decl. at 9. The first such test for which Abbott obtained authorization was designed to run on its existing m2000 system, a large-format machine for use in central laboratories and hospitals. This product received emergency use authorization ("EUA") from FDA early in the crisis, on March 18, 2020. Drysdale Decl. at 9; Godon Decl. ¶ 12.

Eight days later, Abbott gained U.S. authorization for another COVID-19 test, the

- 3 -

molecular diagnostic test ID NOW, which also runs on an existing Abbott diagnostic platform. Drysdale Decl. at 9; Godon Decl. ¶ 12. ID NOW is a small, point-of-care test, and like m2000 it detects the presence of the virus using a sample collected by nasal swab. Godon Decl. ¶ 12. Calling on decades of excellence in manufacturing, Abbott quickly pivoted to making these tests to meet demand. It has now shipped more than 15 million molecular diagnostic tests for COVID-19. *Id.*

Abbott simultaneously worked to meet a related area of critical demand: *serology* tests (or blood tests) that detect the presence of antibodies generated by the immune system during and after COVID-19 infection. On April 14, 2020, Abbott received the European "CE mark" authorization for its point-of-care antibody test on the Abbott Panbio® system. Godon Decl. ¶ 14. It followed up, 12 days later, with April 26 authorizations from FDA for COVID-19 serology tests developed to run on Abbott's Architect and Alinity I systems. *Id*. ¶ 13. And it did all this while producing the tests en masse for consumers who desperately needed them. Abbott has now shipped more than 14 million COVID-19 serology tests. *Id.*

Abbott did not stop there. On May 11, it received an EUA for its third molecular diagnostic test, for use on Abbott's large-format Alinity m system. Drysdale Decl. at 10; Godon Decl. ¶ 12. It has worked throughout the summer to continue developing new critical products to meet the challenge of COVID-19, and within the last month has released still *more* tests: an antigen test on the Panbio® platform which detects the virus and which received the CE mark on August 18, 2020, and the new BinaxNOW® product. Godon Decl. ¶¶ 14, 16.

### III.   Abbott's BinaxNOW® COVID-19 Test Is a "Game-Changer"

Hailed as a "game-changer," Abbott's BinaxNOW® COVID-19 diagnostic test is portable, affordable, and fast. *Id*. ¶ 22.[2] It is the size of a credit card. It costs 5 dollars.

---

[2] David Goldman *et al.*, *This $5 Rapid Test is a Potential Game-Changer in COVID-19 Testing*, CNN, Aug. 27, 2020, *available at* https://www.cnn.com/2020/08/27/investing/abbott-labs-rapid-covid-test/index.html; (continued on next page)

CASE NO. _____                                    MPA ISO EX PARTE APP. FOR TRO

And it provides results in 15 minutes. *Id.* ¶ 16. FDA granted an EUA for BinaxNOW® on August 26, 2020. *Id.* ¶ 16. The next day, the United States Department of Health and Human Services ("HHS") announced a large purchase of BinaxNOW® tests from Abbott. *Id.* ¶ 22. According to HHS, Abbott's test will help public health officials "track the virus like never before and protect millions of Americans at risk in especially vulnerable situations." *Id.*

## IV.   Abbott Uses Protected Trademarks To Sell COVID-19 Tests

Abbott is not just a world leader in medicine, science, and technology, but also markets a diverse array of well-known products such as Similac infant formula, nutritional products such as Ensure, diabetes care products, and pharmaceuticals.[3] It is one of the world's most recognizable and trusted brands in any industry. Abbott was recently recognized on the Dow Jones Sustainability Index, one of the most prestigious global benchmarks for corporate sustainability, as a Global Industry Leader in sustainability for the seventh consecutive year. Koval Decl. ¶ 5. *Fortune* magazine has named Abbott as one of the World's Most Admired Companies every year since 1984. *Id.* And just last year Abbott's FreeStyle Libre continuous glucose monitoring system received the highest award in its field, a top Galien Foundation prize that is the equivalent of the Nobel Prize in biopharmaceutical research. *Id.*

Abbott has invested millions of dollars and immeasurable effort in developing and promoting its business, which includes well-recognized subsidiaries and business units such as Abbott Diagnostics and Abbott Molecular, under protected trademarks. Godon Decl. ¶¶ 5, 24. Abbott's marks are used to promote products in digital and print media, on

---

Advisory Board, *A "Game Changer"? White House Strikes $750M Deal for 150M Rapid Coronavirus Tests*, Aug. 28, 2020, *available at* https://www.advisory.com/daily-briefing/2020/08/28/coronavirus; Subham Sharma, *Is Abbott's Rapid COVID-19 Test the Biggest Game-Changer?*, NewsBytes, Aug. 28, 2020, *available at* https://www.newsbytesapp.com/timeline/world/65255/307554/us-approves-abbott-s-5-rapid-covid-19-test; Dale Yuzuki, *BinaxNOW COVID-19 Ag Card Is the Beginning of the End*, Next Generation Technologist, Aug. 29, 2020, *available at* https://www.yuzuki.org/binaxnow-covid-19-ag-card-is-the-beginning-of-the-end/.

[3] *E.g.*, Abbott Nutrition, Brands, https://abbottnutrition.com/brands (describing Similac and Ensure).

television, and on all social media channels. *Id.* ¶¶ 25, 27. Abbott spends millions of advertising dollars each year so that customers associate the Abbott name with Abbott Laboratories. *Id*. ¶ 25. Regarding the infringement at issue in this case, Abbott's trademarks include at least those attached here as Exhibit A, which provides details for Abbott's longstanding mark "ABBOTT" (the "Abbott Marks"). Each of these marks has been registered with the United States Patent and Trademark Office and has become "incontestable" under federal law. *See* Ex. A to Complaint.

As reflected in the marketing materials submitted here, Abbott promotes its COVID-19 tests using these marks. *See generally* Godon Decl. ¶ 32, Exs. 2-7, 11-15. Its marketing showcases Abbott's name as the gold standard in COVID-19 testing.

## V.     Abbott Has Earned Wide Notoriety As a Brand To Trust In COVID-19

Building on over a century of work to become a world leader in diagnostics, Abbott has worked tirelessly to reach the small top tier of companies meeting the COVID-19 testing challenge. Since the pandemic began Abbott has been the subject of almost daily news coverage featuring its development and manufacturing of COVID-19 tests. *See* Koval Decl. 6 & n. 2 *infra*.

All of this publicity has captured the attention of consumers, who are now turning to Abbott's tests en masse to prevent the spread of the disease. Unfortunately, it has also attracted a parade of scam artists, the latest of which is the subject of this case.

## VI.    Abbot Genetics Is a Pandemic Opportunist

Abbot Genetics (one "t") was incorporated in Delaware on March 30, 2020, within two weeks of Abbott's first two U.S. authorizations for COVID-19 tests. Wilcox Decl. ¶ 3. The business address listed on its website is an office in West Los Angeles, and its registered address is a mailbox drop location in Beverly Hills. *Id*. ¶ 4.

Abbot Genetics' website (www.abbotgenetics.com) describes it as an "early-stage" company that provides "COVID-19 antibody testing solutions." *Id.* ¶ 8. The website is a jumble of unintelligible medical terms, promising "aggressive population risk stratification" and "calibrated technologies for caregiver safety." *Id.* Really, Abbot

- 6 -

Genetics does nothing more than sell COVID-19 tests and equipment under the Abbott name. *See id.* It accepts sales proceeds in an account with JP Morgan Chase Bank associated with Abbot Genetics' name and principal place of business. Volpi Decl. ¶ 8.

Comparing the timing of Abbot Genetics' formation with Abbott Laboratories' own successes in the COVID-19 space shows exactly where Abbot Genetics derived its business idea. The point is illustrated clearly in the timeline attached to this memorandum as Exhibit B. Over a century after Abbott's founding, and in the wake of its achievements in the COVID-19 space, Abbot Genetics appeared out of nowhere. Yalley formed the company less than three weeks after the World Health Organization declared a pandemic, using the barely misspelled name of a leading healthcare company. It is clear he did so for the sole purpose of drafting off Abbott's hard work and consumer goodwill.

Abbot Genetics (one "t") has no connection to the "Abbott" (two "t"s) whose name it is using to sell COVID-19 tests. No one associated with Abbot Genetics has any known affiliation with Abbott. Abbot Genetics is not authorized to use Abbott's trademarks. Nobody at the company appears to have the surname "Abbot." Instead, from all appearances, Yalley adopted the name to exploit Abbott Laboratories' goodwill and give his pop-up company an appearance of legitimacy.

## VII.   Abbot Genetics' Infringement May Spread Through a Web of International Collaborators

Abbott's investigation into Abbot Genetics' business practices is ongoing. Lebron Decl. ¶ 13. So far, however, Abbott's investigation shows that Abbot Genetics and Yalley may be but one head of an international hydra.

Based on investigation to date, Abbot Genetics' manufacturing occurs through a Chinese company called Jiangsu Dablood Pharmaceutical Co. Ltd. ("Dablood"). Dablood in turn may be "repackag[ing]" its own COVID-19 tests using the infringing "Abbot Genetics" brand name. Lebron Decl. ¶ 4 & Ex. 1. Abbot Genetics' web of distributors then stretches from Dablood, in China, to a network of others peddling its infringing products to various customers across the globe. Although more information about the

distribution network is urgently needed, it appears there may be players in Hong Kong, where Abbot Genetics' partner "Sunmed Biosciences" is located, and in Mexico, where Vinitori Comercializadora, S.A. de C.V., a Mexican company, appears contracted to distribute COVID-19 tests in Mexico and South America under the "Abbot Genetics" name. Wilcox Decl. ¶¶ 21, 24, Exs. 15, 18; Lebron Decl. Ex. 1. Information found online places Abbot Genetics officers in Hong Kong and Brazil. Wilcox Decl. ¶¶ 28-30.

## VIII.  Abbot Genetics' Products Are on FDA's "Do Not Distribute" List

The products Abbot Genetics sells through this network have been flagged by FDA for reliability concerns. According to FDA records, Dablood—which manufactures Abbot Genetics-marketed tests—previously provided notice to FDA of its intent to distribute the tests in the United States under an FDA policy allowing for early distribution of certain tests upon notification by the manufacturer. Drysdale Decl. ¶¶ 5-13. That authorization was subsequently revoked by the FDA, which has now added Dablood to a list of manufacturers whose tests "should not be distributed." *Id.* ¶¶ 18-21. Revocation can be based, among other things, on "significant problems [with] a test that cannot be or have not been addressed in a timely manner." *Id.* at 8. Here, FDA withdrew the authorization based upon concerns that the Dablood antibody tests might produce false positives. Drysdale Decl. ¶ 16.

Abbot Genetics' website now announces a new, August 1, 2020 agreement with a manufacturer called "Beijing Wantai," which *does* have an EUA from FDA. Wilcox Decl. ¶ 11; Req. for Judicial Notice ("RFJN") Exs. 8, 9. Investigation has not confirmed whether Abbot Genetics actually sells Beijing Wantai tests.

## IX.   Abbot Genetics' CEO Nana Yalley Is a Fly-By-Night Scam Artist

Abbot Genetics' Chief Executive Officer is Nana Yalley. Wilcox Decl. ¶ 4. Abbott's investigation into Yalley is ongoing, but has revealed the following:

Born abroad, Yalley has bounced around the country and world throughout his life. He represents himself as a native of Ghana and claims to have been educated in Norway and Sweden. *Id.* ¶ 14. Public records reflect that he lived in or around Los Angeles as far

- 8 -

back as the 1980s. *Id*. ¶ 15. He appears to have obtained a now-revoked license as a real estate agent in California. *Id*. Records also reflect that he has lived in Florida—he bought property there in 2007, registered to vote there in 2008, and was the defendant in a civil action involving a mortgage foreclosure in Miami-Dade County in 2009. *Id*. ¶ 17.

For decades Yalley has flitted among industries and business ventures, leaving a string of failed businesses in his wake. His LinkedIn profile touts professional experience in a staggering variety of sectors such as clean energy, digital media, biotech, entertainment, talent recruiting, and agronomy. *Id*. ¶ 20. The profile lists stints at companies called KTTV Fox 11 News, Nexcode Inc., Priority Records, L.L.C., FOX International Channels, and N2Growth. *Id*. ¶ 20. Nothing about Yalley's public presence reflects any scientific training or work in the medical industry. *Id*. ¶¶ 15-20.

Yalley rotates his shifting businesses, including his new COVID-19 venture, in and out of the same address in Beverly Hills. He has submitted corporate filings on behalf of numerous businesses that have occupied the same address—for many, the very same "Suite 1407" that is now Abbot Genetics' registered address. *Id*. ¶ 18. His companies include: (1) Agro Brasilia Exporters Inc., a California corporation active since 2016 in "agriculture procurement"; (2) Repleniq, Inc., a defunct Nevada corporation formed in 2015; (3) NY Family Investments LLC, a suspended California limited liability company formed in 2014 to handle "real estate investments"; (4) EVP M-One Biotech Corporation, a defunct Nevada corporation formed in 2014; (5) Goldcross Holdings, LLC, a defunct Nevada limited liability company formed in 2008; (6) Goldwater Media Enterprises, LLC, a dissolved Nevada limited liability company; (7) Nexcode, Inc., a suspended California corporation formed in 2000 to engage in "internet video streaming"; and (8) All Net Broad Cast.com, Inc., a suspended California corporation formed in 2000 as a "digital audio and video company." *Id*. ¶¶ 18-19.

**X.    Abbot Genetics' Unreliable Tests Are Similar to Abbott's Trusted Ones**

In his latest opportunistic venture, Yalley is peddling COVID-19 tests designed to fool customers into thinking they come from Abbott. Working through an investigator, Abbott's Global Security team carefully orchestrated a purchase of COVID-19 tests from Abbot Genetics.  *See* Lebron Decl. ¶¶ 6-7; Volpi Decl. ¶¶ 3-9. As shown below, Abbot Genetics' packaging not just misappropriates Abbott's name (minus the silent, second "t") but also exploits the same signature shade of blue in which Abbott displays its mark:



Winnard Decl. ¶ 4; Rodgers Decl. Exs. 1 & 2. It is no coincidence that, out of all the colors of the rainbow, Abbot Genetics opted to use the hue that Abbott has been using prominently for 15 years as part of its look and feel. *Id*. ¶ 5. Inside the box, the tests themselves are confusingly similar to Abbott's genuine products:



- 10 -

1    The above graphic compares Abbot Genetics' test cards to those for three Abbott

2  products. Godon Decl. Exs. 4-6; Rodgers Decl. Ex. 6.

3    Similarities among these tests abound. All are COVID-19 tests. Rodgers Decl. ¶

4  11. All are about the size of a credit card. *Id.* All are branded on the outside with Abbott's

5  name (one with, and one without, the second "t"). Both companies offer "lateral flow"

6  tests, with a panel that reads the result through a testing strip, much the way an over-the-

7  counter pregnancy test functions. *Id*. All require the tester to apply a substrate to the

8  testing strip—blood in Abbot Genetics' case, and either blood or another sample

9  depending on which of Abbott's authorized tests is used. *Id.* Abbott's product tests for

10  past or present COVID-19 infection (searching for antibodies or antigens, depending on

11  the product), and Abbot Genetics' purports to do the same (searching for antibodies). *Id.*

12  Abbott's test shows "positive" results with a horizontal line that appears across the test

13  strip, and Abbot Genetics' product purports to provide results the same way. *Id.* But at

14  least one invisible difference separates Abbott's tests from Abbot Genetics' imitations:

15  Abbott's tests all have authorization for distribution either in Europe or in the U.S. Godon

16  Decl. ¶ 10. In contrast, the FDA has instructed healthcare providers not to use Abbot

17  Genetics' test shown above. Drysdale Decl. ¶¶ 18-21.

18    Abbott and Abbot Genetics sell their COVID-19 products in some of the same

19  markets and to overlapping classes of consumers. This includes selling directly to

20  healthcare providers—hospitals, clinics, doctors, and nurses. Godon Decl. ¶ 33 (Abbott);

21  Volpi Decl. ¶ 6 (Abbot Genetics). Both companies may also sell to other persons who

22  administer COVID-19 tests. For example, Abbott sells to doctors' offices and other

23  public entities that have healthcare personnel. Godon Decl. ¶ 33. Abbot Genetics is

24  likewise selling its products to "healthcare facilities, practitioners, and organizations,"

25  Volpi Decl. ¶ 6, including potentially to customers based on a mere representation that

26  the buyer's family member is a doctor, Parker Decl. ¶ 5. Abbot Genetics also sells its

27  products via online retailers, apparently to anyone with an internet browser. Wilcox Decl.

28  ¶ 13.

Abbot Genetics' infringing product poses a public health risk. Abbott's numerous COVID-19 tests have received regulatory authorization, stand on years of research, and reflect millions of dollars in research and development. Godon Decl. ¶ 18; Drysdale Decl. at 9-10. Abbott's proprietary BinaxNOW® testing methodology, for example, has previously been deployed in diagnostics for numerous other diseases, including influenza. Godon Decl. ¶ 18. By contrast, Abbot Genetics has existed for a few months; is led by a CEO with no apparent scientific background and no proven experience in the healthcare industry; and enjoys a "repackaging" agreement with a Chinese manufacturer whose product is on FDA's "do not distribute" list. Public health, trademark law, and basic fairness demand that this grifter be stopped from luring in patients with a false invocation of Abbott's name—and that healthcare professionals and their patients be spared from the confusion of trying to distinguish between the genuine article and an imposter.

## LEGAL STANDARD

Under well-established Ninth Circuit law, a plaintiff is entitled to a preliminary injunction or a temporary restraining order if it satisfies either of two tests. First, a plaintiff may establish that: (i) it is likely to succeed on the merits; (ii) it is likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities tips in its favor; and (iv) an injunction is in the public interest. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, a plaintiff may obtain a preliminary injunction or a restraining order if it can establish that there are serious questions going to the merits and that the balance of hardships tips sharply in the plaintiff's favor, so long as the plaintiff also demonstrates that there is a likelihood of irreparable injury and the injunction is in the public interest. *See All. For Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). A temporary restraining order may issue without notice to the defendant where a plaintiff can show "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

- 12 -

Courts in this district have readily granted provisional relief when a party's trademark is infringed by a competitor. *FAZE Apparel, LLC v. Faze Clan, Inc.*, No. 2:18-CV-02052-RGK-JEM, 2018 WL 3830027, at *8 (C.D. Cal. May 22, 2018); *Ossur HF v. Manamed Inc.*, 331 F. Supp. 3d 1005, 1017 (C.D. Cal. 2017); *see also Robinson v. Delicious Vinyl Records Inc.*, No. CV 13-4111-CAS, 2013 WL 3983014, at *7 (C.D. Cal. Aug. 1, 2013) ("Courts have repeatedly found that losing control of one's reputation and good will in the marketplace supports the issuance of an injunction." (collecting cases)).

## ARGUMENT

Because Abbott is likely to succeed on the merits of its trademark claims and will suffer irreparable harm in the absence of preliminary relief, and because the equities and public interest cut in favor of relief, Abbott is entitled to a temporary restraining order. So that Defendants do not dissipate their assets and deprive Abbott of the opportunity to obtain meaningful redress for its injuries, Abbott also requests the Court freeze Abbot Genetics' bank account, order an accounting, and transfer to Abbott control of Defendants' website.

### I.   Abbott Is Likely To Succeed On The Merits Of Its Claims

### A.   Abbott Is Likely To Succeed On Its Infringement, False Designation, and Unfair Competition Claims

Abbott's claims under the Lanham Act for trademark infringement and false designation of origin, as well as under California law for trademark infringement and unfair competition, require showing (1) that Abbott has a "valid, protectable mark" and (2) that Defendants' "use of the mark is likely to cause consumer confusion." *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110-11 (9th Cir. 2000); *Kythera Biopharms., Inc. v. Lithera, Inc*, 998 F. Supp. 2d 890, 897 (C.D. Cal. 2014). The elements are satisfied here.

#### 1.   *Abbott Owns Valid, Protectable Marks*

There can be no question that the Abbott Marks are valid and protectable. Abbott has not just registered these marks with the USPTO, but they are established as

- 13 -

*incontestable*. *See* Ex. A to Complaint; 15 U.S.C. §§ 1115(b), 1065. Thus, "validity, legal protectability, and ownership are proved." *Stone Brewing Co., LLC v. MillerCoors LLC*, 445 F. Supp. 3d 1113, 1127–28 (S.D. Cal. 2020) (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)).

**2.    *Abbot Genetics' Use of "Abbot" Is Likely To Cause Confusion***

Courts in the Ninth Circuit evaluate likelihood of confusion according to the eight-factor test set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979): (1) the strength of the protected mark; (2) the similarity of the infringing mark; (3) the relatedness or proximity of the goods; (4) the defendant's intent in choosing the market; (5) the type of goods and the degree of care likely to be exercised by the purchaser; (6) the marketing channels used; (7) the likelihood of expansion of product lines; and (8) any evidence of actual confusion. *See id.*; *see also Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). *Sleekcraft* analysis is "an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011). Here, the relevant *Sleekcraft* factors strongly favor Abbott, and compel the conclusion that confusion is likely.

**Strength of the Mark.** A mark's strength rests on both its conceptual strength—*i.e.*, its level of distinctiveness—and its commercial strength. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126-27 (9th Cir. 2014). The Abbott Marks here derive from the surname of the company's founder, physician Wallace Calvin Abbott. Godon Decl. ¶ 23. Abbott has spent more than 120 years doing business under that name, and has developed a reputation as one of the world's foremost healthcare companies, with 100,000 employees and operations in 160 countries. It spends millions of dollars every year advertising and widely promotes its diagnostic products under the protected marks. Godon Decl. ¶ 25, Exs. 2-7, 11-15. It has garnered significant recognition and awards for its efforts. Koval Decl. ¶ 5. The Abbott Marks are unquestionably strong.

**Similarity of the Marks.** In assessing the similarly of marks, courts in the Ninth Circuit hold that: (i) similarity is best evaluated by appearance, sound and meaning; (ii)

marks should be considered in their entirety and as they appear in the marketplace; and (iii) similarities are more important than differences. *See Pom Wonderful LLC*, 775 F.3d at 1127-28 (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). As the similarity between marks increases, so does the likelihood of confusion. *Id.* (citing *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1206 (9th Cir. 2000)). Here, the marks "Abbott" and "Abbot" are identical in sound, indistinguishable in meaning, and different in appearance only by virtue of a silent second letter "t" in Abbott's registered mark. What is worse, misspellings abound in the healthcare marketplace; indeed, customers routinely use Defendants' own, one-"t" spelling when they clearly mean to refer to Plaintiff's famous brand.[4] Nor does Defendants' addition of "Genetics" to their name distinguish their mark. On the contrary, it makes the confusion worse. Abbott has a long-established practice of conducting business in different divisions that use the "Abbott" name alongside a descriptive title: Abbott Diagnostics, Abbott Molecular, Abbott Diabetes Care, and Abbott Nutrition are just a few examples. Defendants' use of the full name "Abbot Genetics" thus exacerbates rather than alleviates the likelihood of confusion, especially among healthcare professionals and patients who have encountered the names of Abbott's many divisions. This factor overwhelmingly favors Abbott.

      **Proximity or Relatedness of the Goods.** Abbott and Abbot Genetics both sell COVID-19 diagnostic tests. The competing goods are not just proximate; their "use and function" are identical and entirely "overlap," and they are sold to some of the same classes of purchasers: healthcare providers, hospitals, and others, who may administer COVID-19 testing. *Sleekcraft*, 599 F.2d at 350. Courts regularly hold, under similar circumstances, that where companies compete in similar markets and target similar customers, the goods are proximate. *Ossur HF*, 331 F. Supp. 3d at 1015 (proximity factor "strongly" favored plaintiff where companies knee braces "compete in identical

---

    [4] *See, e.g.*, Entercom Communications, Yahoo! News, *Is Abbot's Five Dollar Rapid COVID Test Accurate?*, Aug. 28, 2020, *available at* https://news.yahoo.com/abbot-five-dollar-rapid-covid-181227862.html.

markets"); *Hero Nutritionals LLC v. Nutraceutical Corp.*, No. SACV 11-1195, 2012 WL 12888838, at *3 (C.D. Cal. Oct. 30, 2012) (factor weighs in favor of plaintiff where vitamin products "target substantially the same consumer"); *JOL Mgmt. Co. v. Polycell Nutraceuticals, Inc.*, No. CV 08-198, 2008 WL 11334472, at *4 (C.D. Cal. Aug. 18, 2008) (granting preliminary injunction and noting proximity factor increased likelihood of confusion where parties' marks both designated arthritis supplements). This factor strongly favors Abbott.

**Degree of Care by Purchaser.** Both Abbott and Abbot Genetics distribute their diagnostic tests to medical companies and healthcare providers. Some such consumers may be reasonably sophisticated, but not all will be. Abbott sells to public entities that have healthcare personnel (Godon Decl. ¶ 33), and Abbot Genetics will sell to anyone claiming remote affiliation with healthcare (Volpi Decl. ¶ 6), and potentially to anyone with an internet connection (Wilcox Decl. ¶ 13). *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999) ( "[E]ntering a web site takes little effort—usually one click from a linked site or a search engine's list"—and thus "[w]eb surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store").

Moreover, under the circumstances, even healthcare providers may be scrambling, and more likely to make unsophisticated purchasing decisions. Courts have recognized, in fact, that medical personnel addressing COVID-19 "are making rapid purchasing decisions," and those "brave and selfless professionals deserve trustworthy supply lines . . . free of misrepresentations, false designations of origin, and unscrupulous profiteering." *3M Co. v. Performance Supply, LLC*, No. 20-CIV-02949-LAP-KNF, --- F. Supp. 3d ----, 2020 WL 2115070, at **13–14 (S.D.N.Y. May 4, 2020) (enjoining sale of infringing face masks during COVID-19). Even under ordinary circumstances, diagnostic products intended for "use in the treatment of closely parallel and medically related conditions" are likely to be "closely associated in the minds of those who prescribe and dispense them." *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971).

That risk is heightened in these extraordinary times. This factor favors Abbott as well.

**Defendant's Intent in Choosing the Market.** Abbot Genetics' brazen adoption of the "Abbot" name is a transparent ploy to profit from the goodwill of one of the world's most respected healthcare companies. Abbot Genetics' marketing contains no explanation for the origin of its name. No person affiliated with Abbot Genetics appears to have the surname "Abbot." Abbot Genetics' website in fact freely admits that it is aware of Abbott Laboratories and of the risk of consumer confusion, disclaiming (in sprawling fine print on a hard-to-access "Terms" page) that Abbot Genetics "is not and has never been associated with … Abbott Laboratories or www.abbott.com." Wilcox Decl. Ex. 8. Defendants know exactly what they are doing. And even if they hadn't admitted it already, their illicit intent is obvious from their name itself, just as it would be for a drug company called "Pizer," a beverage company called "Coca Colah," a consumer goods company called "Proctor & Gambl," or a phone company called "Verizone."

**Evidence of Actual Confusion.** "[A]t the preliminary injunction stage, evidence of actual confusion is of diminished importance . . . [b]ecause a motion for preliminary injunction normally occurs early in litigation, at that point parties rarely have amassed significant evidence of actual confusion." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072–73 (9th Cir. 2014). Here, because Abbot Genetics has existed for only a short time and incorporated in its home state just three months ago, proof of actual confusion is not yet available. Thus, this factor does not weigh for or against either party. *Pom Wonderful*, 775 F.3d at 1131; *see also Volkswagen AG v. Verdier Microbus & Camper*, No. C 09-00231 JSW, 2009 WL 928130, at *7 (N.D. Cal. Apr. 3, 2009) (issuing preliminary injunction where there was no evidence of actual confusion); *Palantir Techs. Inc. v. Palantir.net, Inc.*, No. C 07-03863 CRB, 2008 WL 152339, at *7 (N.D. Cal. Jan. 15, 2008) (issuing preliminary injunction absent proven actual confusion).

**Types of Goods and Marketing Channels Used.** Abbott and Abbot Genetics are direct competitors in the exact same industry. Both offer COVID-19 diagnostic tests to identical classes of customers, namely, medical companies and healthcare professionals.

1   In light of the "identical function" of Abbott's and Abbot Genetics' product, "both parties

2   will likely sell their [test] through similar marketing channels," and so "these factors

3   strongly favor [Abbott]." *Ossur HF*, 331 F. Supp. 3d at 1017 (granting preliminary

4   injunction in favor of knee brace manufacturer); *see also Vertos Med., Inc. v. Globus

5   *Med., Inc.*, No. C 09-1411 PJH, 2009 WL 3740709 (N.D. Cal. Nov. 6, 2009) (granting a

6   preliminary injunction to medical device company where infringer's marketing channels

7   overlapped but were not identical).

8          **Likelihood of Expansion of Product Lines.** The final *Sleekcraft* factor assesses

9   the likelihood of confusion where a company may expand its product offerings to

10   encroach more directly upon the plaintiff's trademark. The factor is irrelevant where, as

11   here, the parties "already compete" and their goods are already "related." *Moroccanoil,

12   *Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1177 (C.D. Cal. 2017).

13          **B.     Abbott Is Likely to Succeed on Its Cybersquatting Claim**

14          Finally, Abbott is likely to succeed on its Lanham Act claim for cybersquatting.

15   This claim requires proof that (1) the defendant registered or used a domain name (2) that

16   is "identical or confusingly similar to a protected mark owned by the plaintiff," and (3)

17   "acted with 'bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum*, 624

18   F.3d 1213, 1218-19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)(1)(A)). Each of the

19   three elements of cybersquatting is satisfied here.

20          *First*, Defendants are engaging in commerce using a domain name—

21   abbotgenetics.com—that was registered six months ago. Wilcox Decl. ¶ 7. Their site is

22   operational and continues to promote their infringing products and branding. *Id.*

23          *Second*, Abbot Genetics' domain is confusingly similar to the Abbott Marks. This

24   is true even though Abbot Genetics' domain includes the tack-on suffix "Genetics." 5

25   McCarthy on Trademarks and Unfair Competition § 25A:51 (5th ed.) ("The addition in

26   the accused domain name of generic or descriptive matter to the mark will usually not

27   prevent a finding of confusing similarity."); *see also Rolex Watch U.S.A., Inc. v.

28   *Agarwal*, No. 12-cv-06400-MRW, 2012 WL 12886444, at *13 (C.D. Cal. Dec. 17, 2012)

- 18 -

("rolexblogsite," "rolexgiveaway," and "rolexwatchforum" were clearly derived from the Rolex marks and could lead consumers to believe these were Rolex official sites); *DSPT Int'l*, 624 F.3d at 1222 (holding that the "eq-Italy.com" was "confusingly similar" to plaintiff's protected "EQ" brand); *Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 578 (E.D. Pa. 2002) (stating "louisvuitton-replicas.com" constituted "an identical or confusingly similar use of the Louis Vuitton mark").

*Third*, as described above, Defendants are acting in bad faith. 15 U.S.C. § 1125(d)(1)(b)(i) (listing bad faith factors). They have put Abbott's name in their domain; they are using the website to sell infringing goods; they are operating the website for profit; and the contents of the website betray Defendants' actual knowledge that visitors will mistake their site for Abbott's. All of this establishes Abbot Genetics' bad-faith attempt to siphon Abbott's goodwill and profit from its mark. *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1035 (C.D. Cal. 2010) (granting preliminary injunction where defendants acted "in at least partial bad faith since first registering the domain").

## II.     Abbott Will Suffer Irreparable Harm Absent TRO Relief

A plaintiff "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Moroccanoil*, 230 F. Supp. 3d at 1177 (quoting *Winter*, 555 U.S. at 21). In trademark cases, irreparable harm can be established by the threat of lost "business opportunities, customers, and goodwill" due to the use of "confusingly similar" marks. *Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1196 (C.D. Cal. 2013) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)).

The preliminary relief requested here is necessary to avoid irreparable harm to Abbott's reputation and goodwill as a leading provider of safe, reliable healthcare products. Given the intense public focus on COVID-19 testing and the reliability concerns with Abbot Genetics' tests, the harm to Abbott from Defendants' activities is serious and imminent. There is widespread public scrutiny of healthcare companies competing to sell COVID-19 diagnostics—and rightly so. Testing is all over the news.

The pandemic has dominated press coverage all year, and companies offering testing products have been relentlessly covered by media outlets. Godon Decl. ¶ 37. Abbott itself is in the news almost daily, including in articles covering its development of COVID-19 products. *See* Koval Decl. ¶ 6 & n. 2 *infra.* In this environment, any problem with FDA authorization status is a major issue for the reputation of the product and its maker. Godon Decl. ¶ 36; Koval Decl. ¶ 15. This is especially true for large companies, which the public rightly expects to rise to the occasion and produce solutions to the collective crisis. With much on the line, Abbott is working around the clock to meet demand and provide the public with the gold-standard testing products that consumers expect from Abbott. Godon Decl. ¶ 40.

In this high-stakes, high-visibility environment, Defendants are marketing unauthorized, infringing products under Abbott's name. They are doing so using a website that mixes promises to "put[] Americans back to work" with torrents of vaguely medical mumbo-jumbo about "aggressive population risk stratification" and "calibrated technologies for caregiver safety." Wilcox Decl. ¶ 8. Worse yet, FDA has expressed concerns that Defendants' tests, which are being sold under Abbott's name, will produce unreliable results. Drysdale Decl. ¶ 16. When problems arise with the Abbot Genetics tests, history suggests that Defendants will be long gone. Abbott will be left holding the bag, facing questions about products it did not even manufacture, with no answer but to point to a different company that is no longer there.

The harm threatened goes beyond damage to Abbott's name and brand. This is not a case involving luxury goods like knock-off Rolex watches or fake Gucci bags, although courts regularly conclude that such knock-offs pose a threat of irreparable harm to those legitimate brands. Instead, this case involves a medical product that patients will use to make decisions about their health and safety—decisions that could result in illness or even death to themselves or others. Healthcare providers and their patients deserve a supply chain free of imitators, hucksters, imposters, and look-alikes. "Caveat emptor" is not an appropriate slogan for the purchase of life-saving diagnostics during a pandemic.

Given the likely risk of severe and imminent harm to Abbott's reputation, as well as the health of people who rely on Abbott's brand to deliver reliable test results, a restraining order should issue. *United Artists Corp. v. United Artist Studios LLC*, No. CV 19-828-MWF (MAAx), 2019 WL 3293650, at **12–13 (C.D. Cal. June 3, 2019) (recognizing irreparable harm is not "presumed in trademark cases," but granting injunction where "at this early stage of litigation . . . Plaintiff has introduced evidence of loss of control over its own business reputation and quality control").

### III.   ThePublic Interest And The Balance Of Equities Favor A Restraining Order

A temporary restraining order is in the public's interest both for commercial and public health reasons. "Trademarks protect the public from confusion by accurately indicating the source of a product." *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 715 (9th Cir. 2005). It is "axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1015 (C.D. Cal. 2011) (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983)). Thus, protection of Abbott's incontestable marks is in the public interest. In addition, in the context of the COVID-19 pandemic, the "public interest in an injunction against selling counterfeit or unapproved [diagnostic tests] is also clear," since the public's interest is in "avoiding confusion" and unauthorized products that potentially would put people "at greater risk of transmitting or being exposed to the highly contagious virus causing COVID-19." *BYD Co. Ltd v. Khazai*, No. CV 20-5530-DMG (AGRx), 2020 WL 3893310, at *5 (C.D. Cal. July 10, 2020); *see also 3M*, 2020 WL 2115070, at *13 ("[T]he protection of healthcare professionals who are putting their lives on the line in the fight against COVID 19 is in the public interest. Those brave and selfless professionals deserve trustworthy supply lines of authentic PPE, including N95 respirators, that are free of misrepresentations, false designations of origin, and

unscrupulous profiteering.").

By contrast, it should weigh "little, if at all, in the balance of equities" that preliminary relief means Abbot Genetics "can no longer operate its allegedly infringing website or access funds allegedly derived from illegal activities." *Datatech Enters. v. FF Magnat Ltd.*, No. C 12-04500 CRB, 2012 WL 4068624, at *6 (N.D. Cal. Sept. 14, 2012).

## IV.   A Narrow And Temporary Asset Freeze Is Warranted

If the Court is to preserve effective ability to enter judgment against Defendants for recovery of damages and ill-gotten profits, it must not only restrain their conduct, but also prevent the flight of their assets before the judgment can be collected.

District courts have "inherent power" to freeze the assets—including bank accounts—of defendants in a trademark infringement case. *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992). This authority derives from the court's "equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Id*. Because a plaintiff in a trademark case may seek the equitable remedy of profit disgorgement—as Abbott does here—a district court has authority to freeze the defendant's assets to ensure that such profits remain available to disgorge. 15 U.S.C. § 1117(a); *Datatech Enterprises LLC*, 2012 WL 4068624, at *5. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Courts in this district regularly freeze assets of trademark misappropriators.[5]

Right now, ill-gotten profits from products that infringe the Abbott Marks are flowing into a bank account at JP Morgan. Abbot Genetics (one "t") is accumulating wealth by trading on Abbott's name. Every penny of profit from its sales of illegal and/or

---

[5] *See, e.g., SATA GmbH & Co. Kg v. Wenzhou New Cent. Int'l, Ltd.*, No. 15-08157, 2015 WL 6680807, at *11 (C.D. Cal. Oct. 19, 2015); *Chloe SAS v. Sawabeh Info. Servs. Co.*, No. CV 11-04147 GAF, 2011 WL 13130013, at *6-7 (C.D. Cal. May 17, 2011); *Lions Gate Films Inc. v. Does*, No. 2:14-CV-06033-MMM, 2014 WL 3895240, at *7 (C.D. Cal. Aug. 8, 2014); *Microsoft Corp. v. A-Tech Corp.*, 855 F. Supp. 308, 312 (C.D. Cal. 1994).

unauthorized COVID-19 tests is subject to disgorgement. These assets must be preserved. It would be one thing if this case involved bona fide competitors with a valid dispute over the scope of legitimate branding. Those are not the facts of this case. Abbot Genetics is a six-month-old company hawking high-priced COVID-19 tests, apparently shifting from supplier to supplier as the FDA scrutinizes its products.

It is a near certainty that the assets would move absent a freeze. Abbot Genetics is a pop-up business that operates as part of a multinational syndicate hawking dubious COVID-19 tests. Wilcox Decl. ¶¶ 21-30. Although discovery is urgently needed to find and stop Abbot Genetics' partners, these so far appear in Hong Kong and Mexico. *Id*. Two of its three officers already seem to live abroad, one in Hong Kong and one in Brazil. *Id.* ¶¶ 28-30. Its U.S. "CEO," Nana Yalley, has left behind a long trail of suspended, revoked, rescinded, terminated, and abandoned businesses, which have accumulated like cigarette butts in multiple states over the course of two decades. *Id.* ¶¶ 18-19. Yalley himself boasts publicly of his international credentials (*id.* ¶ 14), which according to Abbott's seasoned Global Security professional points to a serious flight risk (Parker Decl. ¶ 3). Abbot Genetics' profits will vanish like all of Yalley's other ventures unless this Court intervenes. An asset freeze is this Court's only possible means of holding Defendants responsible for their conduct.

Abbott seeks only a narrow, temporary freeze of assets in Abbot Genetics' bank account at JP Morgan; an accounting of Abbot Genetics' JP Morgan account; and an order that Defendants cease using the infringing abbotgenetics.com website pending resolution of Abbott's preliminary injunction motion. *Datatech Enters.*, 2012 WL 4068624, at *6 (freezing assets so trademark defendant "can no longer operate its allegedly infringing website or access funds allegedly derived from illegal activities").

## V.    Abbott Should Not Be Required To Post A Bond

There is no reason to require Abbott—a Fortune 500 company with an $187 billion market capitalization—to post a bond here. Abbott has been in business for over a century. It has been publicly traded since 1929 and is now in the S&P 100. It has over

- 23 -

1   100,000 employees. RFJN Exs. 2-5; Godon Decl. ¶ 5. Abbott is not going anywhere.

2       "Federal Rule of Civil Procedure 65(c) grants district courts wide discretion in

3   setting the amount of a security bond." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733

4   (9th Cir. 1999). The burden is on the party affected by the injunction to present evidence

5   that a bond is needed, so that the district court may exercise its discretion in setting the

6   amount of the bond. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d

7   878, 883 (9th Cir. 2003). "The bond amount may be zero if there is no evidence the party

8   will suffer damages from the injunction." *Id.* at 882 (citing *Gorbach v. Reno*, 219 F.3d

9   1087, 1092 (9th Cir. 2000)). A strong likelihood of success on the merits may favor "a

10  minimal bond or no bond at all." *Avila v. Stearns Lending, Inc.*, No. CV 08-0919-AG,

11  2008 WL 1378231, at *3 (C.D. Cal. Apr. 7, 2008) (quoting *Van De Kamp v. Tahoe Reg'l*

12  *Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985)).

13      Because Defendants' *entire business* exists solely for the purpose of profiting off

14  the value of Abbott's name, there can be no genuine harm at all from a temporary

15  restraining order requiring the relief requested by this *ex parte* application. Accordingly,

16  unless and until Abbot Genetics makes an affirmative showing of harm, the Court should

17  exercise its discretion by declining to require a bond at all. *Innersvingen AS v. Sports*

18  *Hoop, Inc.*, No. CV 12-05257 R (JCGx), 2012 WL 3048363, at *2 (C.D. Cal. July 26,

19  2012); *see also Johnson*, 572 F.3d at 1086 (district court may dispense with the filing of a

20  bond "when it concludes there is no realistic likelihood of harm to the defendant from

21  enjoining his or her conduct") (internal citation omitted).

22      If a bond is required, the amount should be *de minimis*. *See, e.g.*, *Warner Bros.*

23  *Entm't v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG (CWx), 2013 WL 12114836, at *14

24  (C.D. Cal. Jan. 29, 2013) ($10,000 bond from Warner Brothers related to infringing

25  film); *3 Phases, LLC v. Parker*, No. CV 09-2331 SVW (SSx), 2009 WL 10669748, at *9

26  (C.D. Cal. May 27, 2009) ($10,000 bond adequate for preliminary injunction).

27

28

CASE NO. _____                                    MPA ISO EX PARTE APP. FOR TRO

**CONCLUSION**

A restraining order is necessary to stop Defendants from profiting on COVID-19 tests that bear Abbott's valuable trademark. The Court should issue an order that (1) temporarily restrains Defendants' infringement of the Abbott Marks; (2) freezes the bank account where Abbot Genetics receives revenue from the sale of its illegal COVID-19 tests; (3) directs JP Morgan Chase Bank to produce, within 5 business days, a full accounting of Abbot Genetics' bank account to effectuate that freeze; (4) precludes the operation of the website where Defendants are selling COVID-19 tests under Abbott's brand name; and (5) requires Defendants to show cause why their conduct should not be preliminarily enjoined. In the event Abbott's request for a temporary restraining order is denied, Abbott requests that the Court set this matter for a preliminary injunction hearing on an expedited basis.

DATED: September 14, 2020          Respectfully submitted,

CONRAD & METLITZKY LLP

_With express Permission_

_____

WARREN METLITZKY
ELLEN RICHMOND
MIGUEL GRADILLA
Attorneys for Plaintiff Abbott Laboratories

- 25 -